# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 05-2603

_____

United States of America,　　　　*
　　　　　　　　　　　　　　　　*
　　　　Appellee,　　　　　　　*
　　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*
Nancy K. Bistrup,　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　　Appellant.　　　　　　　*

_____

No. 05-2644

_____

　　　　　　　　　　　　　　　　　　Appeals from the United States
　　　　　　　　　　　　　　　　　　District Court for the District
　　　　　　　　　　　　　　　　　　of Minnesota.

　　　　　　　　　　　　　　　　*
United States of America,　　　　*
　　　　　　　　　　　　　　　　*
　　　　Appellee,　　　　　　　*
　　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*
Alan K. Bistrup,　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　　Appellant.　　　　　　　*

_____

Submitted: March 15, 2006
Filed: April 10, 2006

_____

Before MURPHY, BOWMAN, and BENTON.

MURPHY, Circuit Judge.

Alan and Nancy Bistrup were indicted on federal charges growing out of a fraudulent investment scheme and the related purchase of a townhouse. They went to trial before a jury and were convicted of mail fraud, bank fraud, and making false statements to a financial institution. Alan was also convicted of wire fraud, securities fraud, and money laundering. The district court[1] sentenced Alan to 188 months and Nancy to time served, and they both appeal. Alan raises sentencing issues while Nancy argues that the evidence was insufficient as to her and that she is entitled to a new trial because of trial rulings by the district court. We affirm.

I.

In 1997 Alan and Nancy Bistrup lived in a small town in southern Minnesota. Alan owned and operated Eagle Distributing, a company which sold vacuums and related products, and Nancy was employed as a teller at U.S. Bank in Mankato with an annual salary of approximately $15,000. Their lives changed after Alan traveled to the Bahamas to attend a seminar featuring high yielding offshore investment programs promoted by Global Prosperity. Alan invested in the programs with funds from the refinancing of the couple's home and their savings accounts. Although he received some money back on the investments, it was substantially less than the amount invested. As part of the program, he was able to call a Canadian phone number for a "fax on demand" which was supposed to update investors on the progress of their investments.

After Alan Bistrup returned from the Bahamas and through 2002, he solicited others to invest in investment programs. He promoted the programs with his lifetime

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

friends, golfing partners, family members, and community members, assuring them that there was no risk and that the investments would yield high returns. He represented that he would pool the investors' money until it met a minimum threshold and would then invest the pooled money in the programs. He assured potential investors that he had successfully invested significant sums of his own money. Over sixty victims invested more than three million dollars based on these assurances. Some of them refinanced farms, emptied retirement accounts, and took out high interest advances on credit cards in order to gather funds to invest. Alan gave some of them a promissory note on which he had inserted his name as guarantor.

Although Alan Bistrup transferred a portion of the investors' funds to persons in Canada, he diverted most of the money to personal use. Nancy recorded the deposit of investor funds in the couple's checkbook registers, as well as their own expenditures including living expenses, trips, and Vikings tickets. He paid back only a small percentage of the early investors with funds he had received from those who invested later. When his victims sought refunds or payments on their investments, he told them that the investments were in various places overseas, that it took time to access their investments, or that the government had temporarily frozen their accounts due to terrorist attacks. He also gave a few investors access to the fax on demand reports.

In late 1998 Alan Bistrup began negotiating the purchase of a townhouse on the Wilds golf course in Prior Lake from Bruce Nedegaard, a contractor who was connected to another investment program run by New Century Group. Nedegaard had built the townhouse for some $1,900,000 in 1995 but it had not sold, and he agreed to sell it to the Bistrups for $1,100,000. After several failed attempts at financing, the transaction was arranged through Norwest Mortgage and U.S. Bank, conditioned on the Bistrups making a down payment of $238,000. Nedegaard and Alan agreed to a secret arrangement to make it appear that the Bistrups were making the required down payment on the townhouse. Alan wrote a $190,000 check to

-3-

Nedegaard that was not intended for deposit, but silently agreed to make monthly payments to Nedegaard over a five year period. Alan requested New Century Group to wire him $250,000 of the $500,000 he had invested with the group so that it would appear that the Bistrups had funds to cover the down payment; Alan returned this money after the closing. In addition to working on the regular mortgage documents, Alan and Nedegaard also prepared others to memorialize their own personal arrangement.

Alan Bistrup prepared a "stated income" mortgage application, which required disclosure of the couple's employment, income, and liabilities, as well as any other financing that would apply to the property. The mortgage application did not reflect either the arrangement with Nedegaard or the promissory notes which Alan Bistrup had given to the investors. The application listed Nancy Bistrup as debtor because she had a superior credit rating. It identified both Nancy and Alan as employees of Eagle Distributing although Nancy did not work for the company. Their monthly incomes from Eagle Distributing were said to be $10,500 for Nancy and $34,000 for Alan. Bank records showing average monthly deposits of more than $22,000 accompanied the application. When U.S. Bank requested further verification of their employment, Alan provided a document stating that Nancy had been employed at Eagle Distributing since 1987 and Alan since 1981 and that their present salaries were $150,000 and $223,000 respectively. The signature line was signed Michael Morrison, the name of a former employee of Eagle Distributing. Neither Alan nor Nancy were receiving any income from Eagle Distributing when they submitted the loan applications.

The Bistrups closed the mortgage transaction on May 21, 1999 with an employee of Gibraltar Title, a loan closer named Kari Brasel. Alan went to Brasel's office in Edina to sign the documents, and Brasel traveled with the loan broker to Mankato to get Nancy's signature. Nancy signed the mortgage documents during her break from her job as a bank teller. Both Alan and Nancy signed a certification on

the loan documents that the information provided in the applications was true and correct and that they understood they could be subject to criminal penalties if the information was false. They also completed an "affidavit regarding purchasers" which provided additional false information concerning their employment. Brasel disbursed the loan proceeds by mail to prior lien holders on the townhouse. The mortgage payment, including the amount secretly owed each month to Nedegaard, amounted to over $15,000 per month. Shortly after closing, Alan represented to potential investors that his investment earnings had enabled the Bistrups to purchase the luxury townhouse, and he regularly invited victims of his fraud to visit the townhouse.

In late 2000 Alan Bistrup worked with the same loan broker at Northwest Mortgage to refinance the mortgage and draw out equity. They submitted an application in Nancy Bistrup's name to Lehman Brothers Bank for a "no-doc loan", which does not require applicants to include information about income but does require disclosure of any indebtedness or liens on the property. The application included an owner affidavit listing Eagle Distributing as Nancy's employer and again failed to reference the secret arrangement with Nedegaard. Lehman Brothers underwrote the mortgage, which resulted in the Bistrups receiving $116,324.95 in cash. Alan and Nancy closed the loan at Brasel's office on January 11, 2001, and they again signed confirmations and affidavits that the application and other documents were accurate.

The Bistrups refinanced once more with Lehman Brothers in 2002. The couple applied under a "stated income" program, requiring them to provide information regarding their monthly incomes and proof from an accountant that Eagle Distributing existed. The application represented that Nancy Bistrup was employed by Eagle Distributing with a monthly income of $35,000 and again failed to disclose the arrangement with Nedegaard. It also did not disclose tax liabilities that had been assessed by the state in 2001 for their failure to file tax returns for 1996, 1997, and

1998. The application contained a statement with the signature of an accountant which stated that Eagle Distributing continued to operate. The refinanced mortgage was closed on May 13, 2002 in Brasel's office, and the Bistrups signed confirmations that the information in the documents was truthful.

Both Bistrups were indicted in 2003 for crimes relating to the investment scheme and the mortgages on the townhouse. A second superceding indictment issued on February 18, 2004 charged Alan Bistrup with seventeen counts of securities fraud in violation of 15 U.S.C. § 78ff, four counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2, one count of making a false statement on a loan application in violation of 18 U.S.C. § 1014, and ten counts of money laundering in violation of 18 U.S.C. § 1956(a)(1). The indictment charged both Alan and Nancy with two counts of mail fraud in connection with the mortgages from U.S. Bank and Norwest Mortgage, in violation of 18 U.S.C. § 1341, two counts of bank fraud, in violation of 18 U.S.C. § 1344, and two counts of making false statements on loan applications in connection with the later mortgages, in violation of 18 U.S.C. § 1014.

The case proceeded to a joint trial. The government called several victims of the fraud who testified that Alan Bistrup had lied to them and convinced them to invest with him by making false statements about his own success and by showing them his townhouse. They explained to the jury that they trusted Alan's assurances because they had known him and his family for a long time and had no indication that he would steal their money. Neither Nancy nor Alan called witnesses of their own, but Nancy attempted to introduce evidence of an affair of Alan's through cross examination of government witnesses. The district court excluded the evidence.

The government witnesses also included the mortgage closer, mortgage broker, and bank representatives. They testified that Brasel had reviewed the application information at all three of the mortgage closings with both Bistrups. Brasel remembered reviewing the information in the 1999 application and having Nancy

Bistrup sign the documents in a café but the broker thought she signed the documents on the hood of a vehicle. Representatives from Norwest Mortgage and U.S. Bank testified that the employment, income, and liabilities of Nancy and Alan were considered when they decided to finance the original purchase. Sheryl Howe, a senior vice president for Aurora Loan Services, testified that all the information provided by the Bistrups was considered in connection with their loan applications to Lehman Brothers for refinancing, that any indebtedness on the property would have been considered by the underwriters had it been provided, and that the company would consider all information provided on a loan application even if some of it had not been required.

The government used a handwriting expert to identify the writer of several documents and gave pretrial notice that it would offer such evidence and that the expert would identify Nancy Bistrup as the person who made entries in the couple's check registers and balanced their checking accounts. The government broadened the scope of its intended expert testimony after Nancy relied on an ignorance defense during her opening statement and during cross examination of witnesses. The government then sought to have its expert testify that Nancy had written Eagle Distributing down as her employer on the 2001 affidavit and that she had signed Alan Bistrup's name on checks, including those written to Nedegaard. The district court permitted the testimony except for that identifying the writer of Nedegaard's checks, although the court indicated that subject could be argued in closing. After the expert and another witness had testified, Nancy moved for a mistrial on the basis that the testimony impermissibly informed the jury of the expert's opinion that Nancy had signed checks to Nedegaard. The court denied the motion but required that the labels the expert had placed on exhibits to identify the check signer had to be removed before the case went to the jury.

The jury returned its verdict on June 16, 2004. It found Alan Bistrup guilty of two counts of mail fraud, two counts of bank fraud, two counts of false statements on

loan applications, fifteen counts of securities fraud, four counts of wire fraud, and ten counts of money laundering. He was acquitted on one count of securities fraud and one of bank fraud. Nancy Bistrup was convicted of two counts of mail fraud, two counts of bank fraud, and two counts of false statements on loan applications.

The district court sentenced Nancy Bistrup to time served[2] and two years of probation for her role in the offenses. It sentenced Alan Bistrup to 188 months after calculating a guideline range of 151 to 188 months based on a total offense level of 34 and category I criminal history. Three guideline enhancements had been applied by the district court in arriving at Alan's offense level under the sentencing guidelines: a two level enhancement for use of sophisticated means in committing his offenses, a two level vulnerable victim enhancement for soliciting money from the widowed and elderly, and a two level role enhancement for his role as an organizer and leader in the fraud.

On her appeal Nancy Bistrup argues that the evidence was insufficient to convict her because she had not knowingly attested to misrepresentations in the loan documents and because the misrepresentations were not material. She asserts that the district court abused its discretion by permitting the handwriting expert to testify to anything but the check registers and by not allowing her to introduce evidence of her husband's affair. Alan Bistrup challenges his sentence, arguing that the district court erred in finding that he was an organizer or leader and that he used sophisticated means. He also maintains that we should remand for resentencing because the district court failed to state an adequate basis for sentencing him at the top of the guideline range.

---

[2]Counsel stated at oral argument that after her indictment Nancy Bistrup had been detained for several hours by the United States Marshals Service.

II.

Nancy Bistrup appeals her conviction, alleging insufficiency of the evidence because the government failed to prove that she knew there were misrepresentations on the loan documents or that the misrepresentations were material. She also argues that she is entitled to a new trial because the district court abused its discretion by permitting the handwriting expert to testify about more than the check registers and by excluding evidence of her husband's affair. The government counters that there was sufficient evidence for the jury to conclude that Nancy had knowingly signed documents containing misrepresentations and that the lending institutions relied on the misrepresentations. It maintains that she opened the door at trial to the expert's testimony and that evidence of her husband's affair lacked probative value.

We review the evidence underlying a conviction de novo but will uphold a verdict if it is supported by substantial evidence. United States v. Fitz, 317 F.3d 878, 881 (8th Cir. 2003). In light of the verdict all evidentiary ambiguities and discrepancies are resolved in favor of the government. United States v. Ramirez, 350 F.3d 780, 783 (8th Cir. 2003).

Although it was Alan who solicited investors and made the secret arrangement with Nedegaard to purchase the townhouse, Nancy Bistrup was also significantly involved in that purchase. There was evidence that she signed loan documents that contained misrepresentations regarding her income, her employer, and her liabilities. The jury could find that Nancy knew about the secret agreement with Nedegaard because she balanced the family checkbook, that she knew that the loan documents did not reflect the secret agreement with Nedegaard, and that she knew that Alan's income was illegal because he took in more money from investors than he invested. There was evidence that a real estate closer explained the mortgage documents to Nancy at each closing and that in 2001 she had written that Eagle Distributing was her employer. The court instructed the jury that it could find knowledge if it found

that Nancy had deliberately closed her eyes to avoid knowing what should have been obvious. Given the testimony of the witnesses and the circumstances surrounding the mortgages, we conclude that a jury could have reasonably found that Nancy Bistrup signed the loan documents knowing that they contained misrepresentations.

Nancy Bistrup also argues that there was insufficient evidence to support the bank and mail fraud convictions because the misrepresentations on the mortgages were not material. Representatives from all three lending institutions testified, however, that they would have assessed the loan differently had they known that Nancy only made $15,000 per year working as a bank teller or that the Bistrups had not actually made the down payment. The Bistrups made the monthly payments with fraudulently obtained funds from an investment scheme, and the banks would have viewed the mortgage application differently had they known the source of the funds. The jury could have reasonably found that the misrepresentations on the loan documents were material.

Nancy Bistrup asserts that the district court abused its discretion by allowing the government's handwriting expert to testify that she had written an "affidavit regarding owner" listing Eagle Distributing as her employer for the 2001 mortgage application and that she had signed Alan Bistrup's signature on checks. The government maintains that Nancy opened the door to this testimony by her ignorance defense at trial. It also argues that any error in permitting the expert to testify on these matters was harmless in light of the overwhelming evidence of guilt. We review a district court's decision to admit expert testimony for an abuse of discretion. United States v. Parker, 32 F.3d 395, 400 (8th Cir. 1994).

Prior to trial the government disclosed that it intended to call a handwriting expert to identify the author of certain writings, including checks and check registers for the Bistrups' personal accounts. Nancy's attorney told the jury during his opening statement that Nancy had signed documents without having read them and also

elicited testimony from government witnesses that Alan had previously signed Nancy's signature and that Nancy was not aware of the secret arrangement with Nedegaard. The government then sought to have the expert testify that Nancy wrote down Eagle Distributing as her employer on her 2001 affidavit and that she had also signed checks with Alan's name, including some written to Nedegaard. The court permitted the testimony regarding the affidavit and checks she had signed; it did not permit the expert to identify the writer of the checks to Nedegaard, however. Nancy's defense opened the door for this expert testimony, see United States v. Gipson, 862 F.2d 714, 717 (8th Cir. 1988), and she chose not to call her own expert. We conclude that the district court did not abuse its discretion in admitting the expert evidence.

Even if the evidence was erroneously admitted, Nancy Bistrup would not be entitled to a new trial if the evidence was harmless. United States v. Oman, 427 F.3d 1070, 1076 (8th Cir. 2005). An error is harmless if it "does not affect substantial rights" of the defendant, Fed. R. Crim. P. 52(a), and "did not influence or had only a slight influence on the verdict." United States v. Carroll, 207 F.3d 465, 470 (8th Cir. 2000). Nancy repeatedly signed loan applications and other documents which falsely stated her employment, her income, and her liabilities, and the jury received evidence that she knew about the payments to Nedegaard because she balanced the family checkbook. Given the overwhelming evidence of guilt, we conclude that any error in allowing the expert witness to testify that Nancy wrote Eagle Distributing on the 2001 affidavit and signed Alan Bistrup's name to checks was harmless. See United States v. Smith, 410 F.3d 426, 429 (8th Cir. 2005).

Finally, Nancy argues that the district court abused its discretion by not allowing her to introduce evidence of her husband's extramarital affair. She argues that evidence of the affair would have supported her defense that her husband had concealed information from her. The government counters that the evidence was inadmissible character evidence and that any probative value of the evidence was

outweighed by its prejudicial effect. We review a district court's evidentiary rulings for an abuse of discretion. United States v. Urbina, 431 F.3d 305, 311 (8th Cir. 2005).

Under Federal Rule of Evidence 404(a), a party may not introduce evidence of prior bad acts to prove "action in conformity therewith," but it may be admissible as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Nancy fails to identify any exception permitting this evidence to come in, and evidence of the affair would not have made it less probable that the mortgage closer had explained the documents to her, that the documents contained false information, or that she signed the documents. Given the possibility that the affair evidence could have confused or misled the jury and unfairly prejudiced Alan Bistrup's defense, we conclude that the district court did not abuse its discretion by excluding evidence of the affair under Rule 403.

III.

Alan Bistrup raises three issues in respect to his sentence. In the first he argues that the district court erred by applying an enhancement for use of sophisticated means. Our review of findings of fact at sentencing is for clear error, United States v. Mashek, 406 F.3d 1012, 1018 (8th Cir. 2005), and the district court's application of the guidelines to the facts is reviewed de novo. United States v. Wells, 127 F.3d 739, 744-45 (8th Cir. 1997). Under USSG § 2B1.1(b)(8)(C) (2003), a two level enhancement should be applied if the offense "otherwise involved sophisticated means." Sophisticated means involves "especially complex or especially intricate offense conduct pertaining to the execution or concealment or an offense." Id. cmt. 7. Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme. United States v. Finck, 407 F.3d 908, 915 (8th Cir. 2005). While some of Alan's individual acts may not have been particularly sophisticated, there were complexities in his overall scheme. He repeatedly lied to his victims, maintained the fraud by using funds from later investors to make partial

payments to earlier victims, and used different financial accounts to maintain and conceal the fraud. Given the extent of the fraudulent scheme, the coordination and planning needed to maintain the scheme for almost five years, and the complexity involved in convincing the banks that the Bistrups had well paying jobs and had provided Nedegaard with a down payment while concealing the five year payment plan, the district court did not err in enhancing Alan's sentence for use of sophisticated means.

Alan also argues that the court erred in applying an enhancement for his role in the offense. He contends that Nedegaard arranged the contract for deed arrangement and that he never directed Nancy's actions. Under USSG § 3B1.1, a defendant's offense level can be increased by two levels if he was an organizer or leader of a criminal activity. A defendant must have at least directed or procured the aid of others for the enhancement to apply. United States v. Encee, 256 F.3d 852, 854 (8th Cir. 2001). Alan approached Nedegaard about the townhouse and initiated the move to Prior Lake. He used the townhouse to lure investors and would have been unable to purchase it without drawing from his own investments had he not been able to involve Nedegaard in the sham transaction and his wife in signing the fraudulent loan documents. A defendant need not exercise direct control for a role enhancement to apply. United States v. Miller, 91 F.3d 1160, 1164 (8th Cir. 1996). We conclude that the evidence supports the role enhancement and that the district court did not err by finding Alan was a leader in the fraud.

Alan Bistrup also contends that he is entitled to resentencing because the district court sentenced him at the top of the guideline range without an adequate statement of reasons in violation of 18 U.S.C. § 3553(c). The district court determined that the sentencing range applicable to Alan was 151to188 months and sentenced him to 188 months. Section 3553(c)(1) requires a sentencing court to "state in open court the reasons for its imposition of the particular sentence" if the

sentencing range exceeds 24 months. United States v. Dumorney, 949 F.2d 997, 997 (8th Cir. 1991). The court stated at the hearing that it had:

> considered the statutory sentence and considerations set forth in 18 United States Code, Section 3553(a), which include the nature and circumstances of the offense and the history and characteristics of the defendant . . . that the sentence imposed is reasonable and appropriate and reflects the seriousness of the offense, promotes respect for the law, and provides just punishment

Since Alan failed to raise this objection at sentencing, we review for plain error. United States v. Babiar, 410 F.3d 432, 434 (8th Cir. 2005). To establish plain error, Alan must establish (1) an error, (2) that was clear or obvious, and not only (3) affected his substantial rights, but also (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Id. Since he was sentenced within the guideline range, his sentence is presumptively reasonable, United States v. Lincoln, 413 F.3d 716, 717 (8th Cir. 2005), and the district court stated its reasons for imposing a 188 month sentence after hearing all of the evidence, reviewing the presentence report, determining the applicability of sentencing enhancements, and calculating a guideline sentence. It is not necessary for a sentencing court to repeat all of its findings when it decides on a specific term of imprisonment. We recognize that the parties, the United States Sentencing Commission, and the administration of justice would benefit from more detailed and tailored statements of reasons, see United States v. Engler, 422 F.3d 692, 696-97 (8th Cir. 2005), but Alan has not shown that the district court committed plain error by failing to do so in his case.

IV.

Since we conclude that the evidence was sufficient to uphold Nancy Bistrup's convictions, that the district court did not abuse its discretion in its evidentiary

rulings, and that there was no reversible error in Alan Bistrup's sentencing, we affirm the judgments of the district court.

_____