# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 08-3616

_____

United States of America,

    Appellee,

  v.

William Reed Jenkins, III,

    Appellant.

   \*
   \*
   \*
   \* Appeal from the United States
   \* District Court for the
   \* Northern District of Iowa.
   \*
   \*
   \*

_____

Submitted: June 12, 2009
Filed:  August 24, 2009

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

William Reed Jenkins, III, pled guilty to two counts of wire fraud in violation of 18 U.S.C. § 1343, and the district court[1] sentenced him to 70 months' imprisonment.  Jenkins appeals his sentence, arguing that the district court erred:  (1) in determining the amount of loss under U.S.S.G. § 2B1.1(b)(1); (2) in applying a sophisticated-means enhancement under U.S.S.G. § 2B1.1(b)(8)(C); and (3) in

_____

[1] The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

applying an abuse-of-trust enhancement under U.S.S.G. § 3B1.3.[2] For the reasons discussed below, we affirm Jenkins's sentence.

## I.    BACKGROUND

Jenkins worked as a licensed insurance agent in California, selling life insurance policies for the Life Investors Insurance Company of America ("Life Investors") and the Fidelity and Guaranty Life Insurance Company ("Fidelity"). Jenkins helped clients prepare their life insurance applications, and he submitted completed applications by facsimile to the insurers' home offices in Cedar Rapids, Iowa (Life Investors), and Baltimore, Maryland (Fidelity). The insurers compensated Jenkins by paying him a commission on each policy sold or renewed—usually a percentage of the policy's yearly premium.

Beginning in July 2000, Jenkins and others devised and carried out a scheme to defraud Life Investors and Fidelity by fraudulently obtaining life insurance policies in the names of people who were in poor health or who did not know that policies were being taken out in their names. By misrepresenting the applicant's background and medical history, Jenkins was able to obtain policies insuring the lives of individuals who were otherwise uninsurable or who were only insurable at a higher premium. The ultimate goal of the scheme was for the co-schemers to collect the policies' death benefits when the insureds died, which would be sooner than the insurance companies' actuarial tables would have predicted because of the misrepresented information. Jenkins stood to benefit from the scheme by collecting commissions on the premiums paid by his co-schemers for these fraudulently-obtained life insurance policies.

---

[2]The district court used the 2001 version of the United States Sentencing Guidelines at Jenkins's sentencing hearing, pursuant to the parties' agreement.

From at least July 2000 until May 2003, Jenkins's co-schemers supplied Jenkins with names and other information to include in the fraudulent life insurance applications. Using this information, Jenkins created the fraudulent applications using various methods, such as: misrepresenting that he had met with the applicant, concealing the applicant's adverse medical conditions, arranging for falsified medical examination results showing that the applicant was in good health, falsifying the applicant's employment status, and forging the applicant's signature. Jenkins also listed the co-schemers as the beneficiaries of the policies. Once the insurer approved the policy application, Jenkins's co-schemers paid the policy premiums and attempted to collect the death benefits upon the insured's death.

When Life Investors and Fidelity discovered the scheme, they immediately cancelled or rescinded all of the fraudulently-obtained policies and notified law enforcement. By that time, however, the insurers had already issued to Jenkins's co-schemers thirty-seven fraudulently-obtained life insurance policies with stated death benefits totaling $10,350,001, received $274,586 from the co-schemers in premiums, and paid Jenkins $86,542 in sales and renewal commissions. The insurers had not paid any death benefits on the fraudulently-obtained policies, and they refunded premiums totaling $197,467 for the cancelled policies.

Jenkins was charged with six counts of wire fraud for his role in the scheme, and he pled guilty to two counts pursuant to a plea agreement. At his sentencing hearing, Jenkins raised three objections to the proposed advisory sentencing guidelines range calculation contained in his Presentence Investigation Report ("PSR"). First, Jenkins contended that the PSR overstated the amount of loss under U.S.S.G. § 2B1.1(b)(1) by finding that he intended for Life Investors and Fidelity to lose $10,350,001—the total amount of death benefits of the fraudulently-issued policies—as a result of the offense. Second, Jenkins argued that the PSR incorrectly determined that the offense involved sophisticated means under U.S.S.G. § 2B1.1(b)(8)(C). Third, Jenkins contended that the PSR wrongly concluded that he

abused a position of trust in facilitating the commission of the offense under U.S.S.G. § 3B1.3. The district court overruled Jenkins's objections, adopted the PSR's advisory guidelines range of 70 to 87 months, and sentenced Jenkins to 70 months' imprisonment. Jenkins now appeals his sentence, alleging the same three points of error that he raised at his sentencing hearing.

## II.    DISCUSSION

In reviewing a defendant's sentence, we first ensure that the district court did not commit significant procedural error, such as an improper calculation of the advisory sentencing guidelines range; then, absent significant procedural error, we review the sentence for substantive reasonableness. *United States v. Magana-Aguirre*, 546 F.3d 957, 959-60 (8th Cir. 2008); *see also Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597 (2007). "In reviewing the sentence for procedural errors, 'we review a district court's interpretation and application of the guidelines de novo and its factual findings for clear error.'" *United States v. Fischer*, 551 F.3d 751, 754 (8th Cir. 2008) (quoting *United States v. Howe*, 538 F.3d 842, 854 (8th Cir. 2008)) (alteration omitted).

### A.    Loss Calculation Under § 2B1.1(b)(1)

We review the district court's loss calculation under U.S.S.G. § 2B1.1(b)(1) for clear error, affording appropriate deference to the district court's determination based on its unique position to assess the evidence and estimate the loss. *United States v. Parish*, 565 F.3d 528, 534 (8th Cir. 2009).

The base offense level for a wire-fraud offense is six, *see* U.S.S.G. § 2B1.1(a), but the Guidelines provide for an enhancement where the loss attributable to the defendant's fraud exceeds $5,000, *see* U.S.S.G. § 2B1.1(b)(1). Under this enhancement, the increase in offense level varies according to the amount of loss.

*See, e.g.*, U.S.S.G. § 2B1.1(b)(1)(B) (adding two levels where the loss is more than $5,000 but not more than $10,000); U.S.S.G. § 2B1.1(b)(1)(K) (adding twenty levels where the loss is more than $7,000,000 but not more than $20,000,000). "As a general rule, the amount of loss [under § 2B1.1(b)(1)] is the greater of actual loss or intended loss." *Parish*, 565 F.3d at 534; *accord* U.S.S.G. § 2B1.1 cmt. n.2(A). In this context, the term "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.2(A)(i), and "intended loss" is defined as "the pecuniary harm that was intended to result from the offense," U.S.S.G. § 2B1.1 cmt. n.2(A)(ii). "A district court's determination of loss need not be precise, although it must reflect a reasonable estimate of the loss." *United States v. Boesen*, 541 F.3d 838, 851 (8th Cir. 2008); *accord* U.S.S.G. § 2B1.1 cmt. n.2(C).

Jenkins first argues that the district court erred by using intended loss for purposes of § 2B1.1(b)(1) because it was impossible to calculate. As such, the court instead should have used actual loss as the loss under § 2B1.1(b)(1). Jenkins calculates the actual loss to be $9,423, the difference between the commissions paid to him ($86,542) and the premiums retained by the insurers ($77,119). An actual loss of $9,423 would have resulted in a two-level enhancement under § 2B1.1(b)(1)(B), rather than the twenty-level enhancement the district court applied under § 2B1.1(b)(1)(K).

In making this argument, however, Jenkins does not dispute the district court's finding that a reasonable estimate of intended loss could be made by totaling the face value of the death benefits on all of the fraudulently-obtained policies and subtracting the value of the insurance premiums that Jenkins's co-schemers intended to pay the insurers. Jenkins also does not dispute the district court's finding that the value of the death benefits the co-schemers intended to receive was $10,350,001. Jenkins's argument focuses instead on his contention that the amount of the premiums that would have been paid is impossible to ascertain because it depends on the insureds' life spans, an unknowable fact.

Jenkins's argument concerning the impossibility of determining the amount of premiums that would have been paid misses the mark. The district court did not need to ascertain the actual amount of premiums that the co-schemers would have had to pay if the scheme had run its course; rather, the district court needed only to make a reasonable estimate of the amount that the co-schemers *intended* to pay in furtherance of the scheme. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). Here, the Government presented evidence showing that many of the insureds were of an advanced age, possessed life-threatening afflictions, or suffered from poor health, making it likely that they would die soon after the fraudulently-obtained policies were issued. Indeed, at least three of the insureds died within two years of the co-schemers obtaining policies on their lives. The Government also showed that the co-schemers had paid only $274,586 in premiums between July 2000 and May 2003, an average of less than $100,000 per year. Based on this evidence, the district court found that "[the] co-schemers intended to pay thousands of dollars in premiums" and that "[the] co-schemers clearly did not intend to pay more than $3 million in premiums on the policies." Thus, the court found that the intended loss was more than $7,000,000 ($10,350,001 in face value of death benefits less up to $3,000,000 in premiums) but not more than $20,000,000, qualifying for the twenty-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K).[3] We find no clear error in the district court's findings, and we conclude that this range is a reasonable estimate of the intended loss. *See Boesen*, 541 F.3d at 851; *United States v. Wells*, 127 F.3d 739, 748 (8th Cir. 1997) ("The court need not determine the value of the loss with any degree of precision; a reasonable estimate of the loss based on the available evidence will suffice.").[4]

_____

[3]Moreover, this intended loss does not account for the $86,542 paid to Jenkins in sales and renewal commissions over the three-year period. Including the intended commission payments to Jenkins would have further increased the amount of intended loss.

[4]While an actuarial analysis could have assisted the district court here in determining the amount of premiums that the co-schemers intended to pay in furtherance of the scheme, such an exacting analysis is not required under the

Jenkins next argues that the district court clearly erred by finding that he, like his co-schemers, intended that Life Investors and Fidelity pay the co-schemers the total amount of death benefits of the fraudulently-obtained life insurance policies as a result of the offense. According to Jenkins, the only losses he intended the insurance companies to suffer were the commissions he received on the policies, not the death benefits which might later be paid to his co-schemers. We disagree. Jenkins stipulated to the following facts in his plea agreement:

B.     . . .  The ultimate goal of the scheme, as defendant JENKINS knew, was for the co-schemers to collect the policies' death-benefits upon the death of the insured. . . .

. . . .

G.     Once a fraudulently-obtained life insurance policy was issued, defendant's co-schemers made premium payments on the policy to keep the policy current until the named-insured died. When a named-insured died, the co-schemers attempted to collect on the life insurance policy's death-benefit. Defendant agrees and admits he knew his co-schemers were attempting to collect death benefits from the fraudulent policies in this manner.

Based on these stipulations, we find no clear error in the district court's finding that Jenkins intended the loss to include the total amount of death benefits of the fraudulently-obtained life insurance policies. *Cf. Parish*, 565 F.3d at 534 (holding that a district court did not clearly err by relying on the admissions contained in a plea agreement when calculating the amount of loss under § 2B1.1(b)(1)). And because the court did not clearly err in making a reasonable estimate that the intended loss was more than $7,000,000 but not more than $20,000,000, we hold that the district court

Guidelines. *See United States v. Hance*, 501 F.3d 900, 909 (8th Cir. 2007) ("The trial court must use a rational calculation method that yields a reliable estimate of the loss; however, the methodology does not have to be mathematically precise.")

properly enhanced Jenkins's base offense level by twenty levels under § 2B1.1(b)(1)(K).

## B. Sophisticated-Means Enhancement Under § 2B1.1(b)(8)(C)

There is a split of authority in our circuit as to whether we review a district court's application of a sophisticated-means enhancement under § 2B1.1(b)(8)(C) de novo or for clear error. *Compare United States v. Anderson*, 349 F.3d 568, 570 (8th Cir. 2003) ("We review the factual finding of whether a [fraud] scheme qualifies as 'sophisticated' for clear error." (quoting *United States v. Brooks*, 174 F.3d 950, 958 (8th Cir. 1999))), *with United States v. Finck*, 407 F.3d 908, 913 (8th Cir. 2005) ("We therefore review *de novo* 'whether the district court correctly applied the guidelines when it determined those facts constituted sophisticated means.'" (quoting *United States v. Hart*, 324 F.3d 575, 579 (8th Cir. 2003))). We need not decide that issue here, however, because we conclude that the more exacting de novo standard of review is satisfied. *Cf. United States v. Fowler*, 535 F.3d 408, 415 n.2 (6th Cir.) (declining to decide a standard of review issue where the de novo standard was satisfied), *cert. denied*, 555 U.S. ---, 129 S. Ct. 661 (2008).

The Guidelines provide for a two-level enhancement where "the offense otherwise involved sophisticated means." U.S.S.G. § 2B1.1(b)(8)(C). Sophisticated means under § 2B1.1(b)(8)(C) are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.6(B). The sophisticated-means enhancement is proper when the offense conduct, viewed as a whole, "was notably more intricate than that of the garden-variety [offense]." *United States v. Hance*, 501 F.3d 900, 909 (8th Cir. 2007). "Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." *Finck*, 407 F.3d at 915.

Jenkins does not dispute the district court's findings of fact concerning the offense conduct that formed the basis for the sophisticated-means enhancement. He argues instead that the district court erred in its legal conclusion that those facts constituted sophisticated means under § 2B1.1(b)(8)(C). According to Jenkins, his scheme was no different than a garden-variety insurance fraud case. We disagree.

The district court found that Jenkins lied about meeting with applicants; forged applicant signatures; provided false driver's license numbers, social security numbers, addresses, and employment information; arranged for a co-schemer to falsify medical examination results and forward them to the insurers; sold dozens of fraudulent policies over a time period of at least three years; and conspired with co-schemers in Texas, California, and Florida to defraud insurers in Iowa and Maryland. Viewed as a whole, these facts show that Jenkins's offense involved sophisticated means. *See United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009) (holding that a district court did not err by applying the sophisticated-means enhancement where a scheme involved "submitting numerous loan applications to lenders containing forged signatures, forged notary stamps, and falsified or altered [documents]"). The number of fraudulent applications that Jenkins submitted and the temporal and geographic reach of this scheme demonstrate "[r]epetitive and coordinated conduct," which can serve as a basis for the sophisticated-means enhancement. *See Finck*, 407 F.3d at 915. Moreover, we conclude that this scheme "involve[d] a greater level of planning or concealment than the typical [insurance] fraud case." *See United States v. Wayland*, 549 F.3d 526, 529 (7th Cir. 2008); *cf., e.g.*, *United States v. Alanis*, 945 F.2d 1032, 1035-36 (8th Cir. 1991) (describing a typical scheme to defraud a life-insurance provider, whereby Alanis falsely submitted her own social security number and driver's license number to obtain an insurance policy in another's name (to satisfy the insurer's residency requirements) and submitted a false death-certificate to the insurer in an attempt to collect the policy's death benefits). Accordingly, we find no error in the district court's application of a sophisticated-means enhancement under § 2B1.1(b)(8)(C).

-9-

## C.     Abuse-of-Trust Enhancement Under § 3B1.3

"We review the legal component of the abuse of trust determination de novo and the district court's factual findings for clear error." *Anderson*, 349 F.3d at 573.

The Guidelines provide for a two-level enhancement under § 3B1.3 where "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. A position of private trust is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. n.1. The commentary to § 3B1.3 provides examples of when this enhancement is applicable:

> This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

"[T]he issue of whether an abuse-of-trust enhancement applies 'is fact intensive because it turns on the precise relationship between the defendant and his victims . . .'" *Septon*, 557 F.3d at 937 (quoting *United States v. Baker*, 200 F.3d 558, 564 (8th Cir. 2000)) (alterations omitted).

Jenkins first argues that he did not occupy a position of private trust in relation to Life Investors and Fidelity because his role as an insurance agent involved less trust than the positions of bank teller or hotel clerk, which are not positions of private trust under the Guidelines. We disagree. The record demonstrates that Life Investors and Fidelity relied upon its licensed insurance agents to be honest and forthright with them by accurately reporting life-insurance applicants' personal information and medical

histories to the best of their knowledge. Such circumstances are hallmarks of a position of private trust. *See United States v. Fazio*, 487 F.3d 646, 659 (8th Cir. 2007) (affirming the district court's application of an abuse-of-trust enhancement as applied to Fazio, "a real estate agent retained by [the victim], an out-of-state company relying on him to be honest and forthright with them"). The insurers' use of additional safeguards to verify the accuracy of applicant information does not compel a contrary conclusion. *See United States v. Erhart*, 415 F.3d 965, 972 (8th Cir. 2005) (rejecting chiropractor's argument under § 3B1.3 that he did not occupy a position of private trust with insurers because "the insurance companies were exacting in their examination of his bill submissions").

Jenkins next argues that the § 3B1.3 enhancement was improper because his relationship with the insurers was an "ordinary commercial relationship," relying on our statement in *United States v. Baker* that "as a matter of law, 'ordinary commercial relationships do not constitute a trust relationship sufficient to invoke the § 3B1.3 enhancement.'" *See Baker*, 200 F.3d at 564 (quoting *United States v. Moore*, 29 F.3d 175, 180 (4th Cir. 1994)). The holding from *Baker* that Jenkins cites, however, is inapposite to this case. In *Baker*, we also recognized that "the issue [under § 3B1.3] is fact intensive because it turns on the precise relationship between the defendant and her victims and therefore cannot be decided on the basis of generalities." *Id.* We went on to hold that "[a]s a matter of law, we conclude that a licensed insurance agent with control over client funds *may* occupy a position of private trust [in relation to her client]." *Id.* Here, we similarly conclude that the circumstances attendant to Jenkins's relationship with Life Investors and Fidelity demonstrated that he occupied a position of private trust. Accordingly, we reject Jenkins's argument, and we hold that the district court did not err in applying the § 3B1.3 enhancement.[5]

---

[5]"After finding that the district court did not commit significant procedural error, as we have here, we would ordinarily review the substantive reasonableness of the district court's sentence." *See Fischer*, 551 F.3d at 756. "However, because [Jenkins] did not provide any argument in his briefs regarding the reasonableness of

## III. CONCLUSION

For the foregoing reasons, we affirm Jenkins's sentence.

_____

---

his sentence, he is deemed to have waived this issue on appeal." *See id.*