# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3241

_____

United States of America

*Plaintiff - Appellee*

v.

Sean M. Meadows

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: March 10, 2017
Filed: August 8, 2017

_____

Before WOLLMAN, COLLOTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Sean Meadows orchestrated a seven-year Ponzi scheme during which he stole more than $10 million dollars from at least 69 victims. He pled guilty to eleven different counts, and the district court sentenced him to 300 months imprisonment. Thereafter, he appealed to this court arguing that the district court erred in applying certain sentencing enhancements and asserting that his sentence was substantively

unreasonable. United States v. Meadows, 637 F. App'x 255, 255 (8th Cir. 2016) (per curiam). Without reaching Meadows's substantive arguments, we reversed and remanded for resentencing because the district court failed to consider the factors presented in 18 U.S.C. § 3553(a) in determining whether Meadows's sentence on the different counts should be consecutive or concurrent. Id. at 256. On remand, the district court[1] addressed the concerns we noted in Meadows's first appeal, and again imposed a 300-month sentence. Meadows now reasserts the substantive arguments he advanced in his first appeal, and we affirm.

## I. Background

Meadows began working as a financial adviser in Minnesota in the late 1990s. Around 2002, he opened Meadows Financial Group. From 2002 through 2014, he amassed more than 100 clients, primarily from Minnesota, Arizona, and Indiana. Meadows marketed himself as a full-service financial adviser, but his primary business concerned the sales of annuities, stocks, and bonds.[2]

In the annuity business, a broker receives a commission from the annuity provider after every sale of that provider's product. Annuity providers also offer customers bonus incentives that vest at a predetermined number of years into the life of the annuity. Early on, Meadows began "churning" his clients' annuity accounts—transferring the clients' accounts from one annuity to another after a short period of time in order to receive multiple commissions from the same investment. Although Meadows received immediate payments from these transfers, his clients

---

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

[2]Under Minnesota law, an individual must be licensed as an insurance producer in order to sell annuities. Meadows held such a license from 1997 through 2014. Likewise, Meadows was a licensed securities broker from 1997 through 2006.

often faced surrender fees of up to ten percent of the value of the annuity. Meadows appeased his clients by telling them that the bonus payments they would receive from the new annuities would more than offset the fees for the transfer. Given that his clients were not, by and large, savvy investors, they continued to trust Meadows's advice.

Around 2007, Meadows announced a high-interest bond held by Meadows Financial Group, and he began soliciting investments from his clients. He assured his clients that the bond was safe, liquid, and guaranteed a high rate of return. In reality, however, the bond did not exist. Over the next seven years, his clients invested over $13 million in this sham bond. During this period, Meadows used about $3.6 million to make Ponzi payments to certain investors who needed the money for one reason or another, but he spent the rest on himself or his family. He used it for personal expenses and salary payments to himself. He made payments to his wife and purchased a new car. He bought investment properties and paid personal credit card bills. He used it to take extravagant trips and spent large sums of money on adult entertainment on multiple occasions. All in all, Meadows spent just over $10.2 million of his clients' money.

In August of 2014, Meadows was indicted on twelve counts: Counts 1 through 3 alleged mail fraud in violation of 18 U.S.C. § 1341; Counts 4 through 10 alleged wire fraud in violation of 18 U.S.C. § 1343; Count 11 alleged money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and Count 12 alleged a transaction involving fraud proceeds in violation of 18 U.S.C. § 1957. Meadows pled guilty to Counts 1 through 10 and Count 12.

At the original sentencing hearing, the district court imposed a sentence of 300 months imprisonment.[3] According to the presentence investigation report (PSR), Meadows had a base offense level of seven. The PSR recommended application of five enhancements: (1) a 20-level enhancement for a total loss amount between $7 million and $20 million; (2) a 4-level enhancement for an offense involving more than 50 but less than 250 victims; (3) a 2-level enhancement for using sophisticated means in furtherance of the crime; (4) a 4-level enhancement for an offense involving a violation of securities law; and (5) a 2-level enhancement for vulnerable victims.

Prior to the hearing, Meadows conceded the applicability of the enhancements for loss amount and number of victims, but he contested those for sophisticated means and violation of securities law. The court overruled Meadows's objections and applied the enhancements. First, noting that the sophisticated means enhancement is only appropriate when the offense conduct as a whole is more intricate than the garden-variety offense, the court found that Meadows's conduct satisfied the standard because he was able to continue the fraud for such a long period of time by repeatedly lying to the victims and making Ponzi payments. Second, the court found that the enhancement for violation of securities law was appropriate because Meadows was an investment adviser at the time and, notwithstanding the fact that the bonds never actually existed, he was recommending the purchase of the securities to his clients.

After application of the enhancements, Meadows's total offense level rose to 39, leading to an advisory imprisonment range of 262 to 327 months. Accounting for the § 3553(a) factors, the court stated that it decided on a 300-month sentence primarily as a result of the egregiousness of Meadows's actions. "My biggest concern," the court noted, "is that you pose a great danger to the public, and that is

---

[3]Because the issues presented in this appeal concern only Meadows's objections to issues raised at the original sentencing hearing, we need not discuss the resentencing hearing at length.

-4-

why you are serving a very long sentence." Additionally, the court stated that, in its opinion, Meadows had shown very little remorse for his actions. The original sentence consisted of 300 months imprisonment on Counts 1 through 10 and 120 months imprisonment on Count 12, all to be served concurrently.

On resentencing, the court again imposed a 300-month sentence, reiterating much of its original reasoning. It clarified, however, that Meadows was sentenced to 240 months for Counts 1 through 10, all to be served concurrently, and 60 months for Count 12, to be served consecutively to the sentence on the rest of the counts. Accounting for the concerns we expressed in Meadows's first appeal about the court's failure to explain its reasoning for imposing concurrent or consecutive sentences, the court stated that concurrent sentencing on all counts would fail to achieve adequate punishment. Thus, the court concluded, a consecutive sentence was "necessary to produce a combined sentence equal to the total punishment."

## II. Discussion

Meadows argues that the district court committed procedural error when it applied sentencing enhancements for the use of sophisticated means and violation of securities law, and he also argues that his sentence is substantively unreasonable. Our first task is to "'ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" United States v. Beckman, 787 F.3d 466, 494 (8th Cir. 2015) (alteration in original) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). In so doing, "[w]e review the district court's factual findings for clear error and its construction and application of the Guidelines de novo." Id. (alteration in original) (internal quotation marks omitted). If we find no procedural errors, we "then consider

the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Gall, 552 U.S. at 51.

We reject each of Meadows's contentions, and address his arguments in turn.

A. Sophisticated Means

Under USSG § 2B1.1(b)(10)(C), a two-level enhancement applies if "the offense . . . involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The commentary to this section defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2B1.1, comment. (n.9(B)). "The sophisticated-means enhancement is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." United States v. Jenkins, 578 F.3d 745, 751 (8th Cir. 2009) (alteration in original) (internal quotation marks omitted). "Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." United States v. Finck, 407 F.3d 908, 915 (8th Cir. 2005). That a scheme involved "sophisticated means" is a factual finding reviewed for clear error.[4] Beckman, 787 F.3d at 496 (internal quotation marks omitted).

Although there is no mechanical test to determine whether a scheme is sufficiently sophisticated to qualify for the enhancement, we have in the past looked at the following factors: (1) the overall length of the scheme, see Jenkins, 578 F.3d

---

[4]In their briefs, the parties articulate varying standards of review on this issue. In United States v. Huston, 744 F.3d 589, 592 n.2 (8th Cir. 2014), we observed that an intra-circuit split had developed regarding whether our review was de novo or clear error, and we clarified that clear error was the proper standard under the first-in-time rule we announced in Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc).

-6-

at 752 ("[T]he temporal and geographic reach of this scheme demonstrate [r]epetitive and coordinated conduct, which can serve as a basis for the sophisticated-means enhancement." (second alteration in original) (internal quotation marks omitted)); United States v. Bistrup, 449 F.3d 873, 883 (8th Cir. 2006) ("Given the extent of the fraudulent scheme, [and] the coordination and planning needed to maintain the scheme for almost five years, . . . the district court did not err in enhancing [the] sentence for use of sophisticated means."); (2) the use of forged or false documents, see United States v. Edelmann, 458 F.3d 791, 816 (8th Cir. 2006); and (3) the use of Ponzi-type payments, see Bistrup, 449 F.3d at 883.[5]  Overall, "the sophistication of the offense conduct is associated with the means of repetition, the coordination required to carry out the repeated conduct, and the number of repetitions or length of time over which the scheme took place."  United States v. Laws, 819 F.3d 388, 393 (8th Cir. 2016).

The enhancement was properly applied.  Meadows's scheme lasted for around seven years and defrauded an exorbitant amount of money from a large number of people.  In order to perpetuate a scheme of this magnitude, Meadows convincingly lied to his investors on a regular basis and made Ponzi payments to appease them. See Bistrup, 449 F.3d at 883.  And the organization required to facilitate such a longstanding fraud demanded "repetitive and coordinated conduct."  See Beckman, 787 F.3d at 496 (internal quotation marks omitted).  Further, when combined with his improper use of tax and investment forms and his admitted use of forged statistics on at least one occasion, Meadows's conduct suffices to trigger the enhancement despite the fact that none of his actions, taken alone, was especially intricate.  See Edelmann, 458 F.3d at 816; Finck, 407 F.3d at 915.

---

[5]This is not an exhaustive list.  The factors chosen simply represent those implicated by the case at bar.

B. Violation of Securities Law

Under USSG § 2B1.1(b)(19)(A), a four-level enhancement applies "[i]f the offense involved . . . a violation of securities law and, at the time of the offense, the defendant was . . . an investment adviser." Meadows concedes that he is an investment adviser, so our analysis focuses on whether there was a violation of securities law. His sole argument on this issue is that there can be no violation of securities law here because the bonds he sold never existed. We disagree.

To define "securities law," the Guidelines incorporate the meanings given to the term in "18 U.S.C. §§ 1348, 1350, and the provisions of law referred to in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47))." Id. § 2B1.1, comment. (n.15(A)). Section 78c(a)(47), in turn, incorporates the entirety of "the Securities Act of 1933 (15 U.S.C. [§] 77a et seq.), the Securities Exchange Act of 1934 (15 U.S.C. [§] 78a et seq.), . . . [and] the Investment Advisers Act of 1940 (15 U.S.C. [§] 80b et seq.)." Importantly, "[a] conviction under a securities law . . . is not required in order for subsection (b)(19) to apply." USSG § 2B1.1, comment. (n.15(A)). Instead, the Government is required to show only by a preponderance of the evidence that the enhancement is applicable. See Beckman, 787 F.3d at 494.

Before the district court, the Government listed a number of provisions it claimed supported application of the enhancement. Among them was Rule 10b-5, which the Securities and Exchange Commission promulgated under the Securities Exchange Act of 1934 (the "Act"). See USSG § 2B1.1, comment. (n.15(A)) (stating that the definition of "securities law" also includes "the rules, regulations, and orders issued by the Securities and Exchange Commission"). Under that rule, when done "in connection with the purchase or sale of any security,"

> [i]t shall be unlawful for any person . . . , by the use of any means or instrumentality of interstate commerce, . . .

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. Here again, Meadows does not contest that he sold fake bonds. Thus, he employed a "device, scheme, or artifice to defraud," made "untrue statement[s] of a material fact," and "engage[d] in an[] act, practice, or course of business which operate[d] . . . as a fraud or deceit upon" his victims. See id. Meadows's specific argument, therefore, is that he did not commit this fraud "in connection with the purchase or sale of any security," see id., because he never actually purchased or sold any securities.

This argument is foreclosed by the broad statutory text. Under the Act, "[t]he term 'security' means *any* . . . bond." 15 U.S.C. § 78c(a)(10) (emphasis added). Similarly, the Act includes "*any* contract to . . . purchase" and "*any* contract to sell" in its respective definitions of "purchase" and "sale." Id. § 78c(a)(13)-(14) (emphases added). Although derivations of Meadows's argument have arisen infrequently in the past, courts have unanimously found that fictitious securities qualify as "securities" under the Act. See United States v. Schlei, 122 F.3d 944, 972-73 (11th Cir. 1997) ("The district court did not abuse its discretion in instructing the jury that counterfeit, forged, and nonexistent securities are included within the definition of a security."); Seeman v. United States, 90 F.2d 88, 89 (5th Cir. 1937) ("It is difficult to imagine any transaction that would be better calculated to deceive and defraud a purchaser than to sell and ship him forged imitations of genuine bonds."); SEC v. Markusen, 143 F. Supp. 3d 877, 888 (D. Minn. 2015) ("By extracting fake research fees, Markusen and Archer violated the scheme liability provisions of . . . Rule 10b-5(a) and (c) . . . ."). Further, it is axiomatic that Meadows's acceptance of $13 million in exchange for

these securities qualifies as a "sale." We find these cases persuasive and hold that the sale of a fraudulent bond violates Rule 10b-5.

Our holding is reinforced by the policies underlying the securities laws. Among others, "Congress' objectives in passing the Act w[ere] to insure honest securities markets and thereby promote investor confidence after the market crash of 1929 . . . [and] to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*." SEC v. Zandford, 535 U.S. 813, 819 (2002) (citations omitted) (internal quotation marks omitted). In its use of the broad language outlined above, Congress thus sought "to achieve a high standard of business ethics in the securities industry," see id. (internal quotation marks omitted), by "prevent[ing] further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation," United States v. Naftalin, 441 U.S. 768, 775 (1979) (internal quotation marks omitted). Meadows's interpretation of the "in connection with" language would effectively *lessen* his sentence because he stole *all* of the money his clients entrusted to him, rather than investing some and stealing the rest. Such an outcome stands at odds to these Congressional objectives.

The district court therefore properly applied the enhancement for violation of securities law by an investment adviser.

C. Substantive Reasonableness

Meadows's final contention is that his 300-month sentence is substantively unreasonable. His primary arguments on this point are that the district court failed to consider his post-conviction rehabilitative efforts and that the sentence creates a forbidden sentencing disparity, but he also asserts that the court improperly weighed the § 3553(a) factors. We discern no abuse of discretion.

"Sentences within the guideline range are presumed to be substantively reasonable." United States v. Rubashkin, 655 F.3d 849, 869 (8th Cir. 2011). When assessing the substantive reasonableness of a sentence, our review is guided by the factors from § 3553(a). United States v. Callaway, 762 F.3d 754, 760 (8th Cir. 2014). "[D]istrict courts are allowed wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." Id. (internal quotation marks omitted). "Where [a] district court in imposing a sentence makes an individualized assessment based on the facts presented, addressing the defendant's proffered information in its consideration of the § 3553(a) factors, such sentence is not unreasonable." United States v. Parker, 762 F.3d 801, 812 (8th Cir. 2014) (alteration in original) (internal quotation marks omitted).

Given that this sentence is within the Guidelines range of 262 to 327 months, we begin from a presumption of reasonableness. See Rubashkin, 655 F.3d at 869. Citing Pepper v. United States, 562 U.S. 476 (2011), Meadows first contends that the court failed to give significant weight to his post-conviction rehabilitation evidence. To be sure, Pepper held that "a district court may consider evidence of a defendant's rehabilitation since his prior sentencing and that such evidence may, in appropriate cases, support a downward variance from the advisory Guidelines range." Id. at 490. But "nothing in Pepper requires a district court to reduce—or increase—a sentence based on such evidence." Parker, 762 F.3d at 812. The court here acknowledged that it had received and reviewed all of this evidence, and it even referenced the evidence when discussing its reasons for imposing the 300-month sentence. Despite Meadows's belief that the court should have assigned greater weight to the evidence, the record reveals that the court acted within its discretion. See United States v. Midkiff, 614 F.3d 431, 445 (8th Cir. 2010) ("Although Midkiff believed that his charitable deeds should have been given greater weight, the district court did not find his arguments for leniency sufficiently compelling to warrant a greater variance and did not abuse its discretion in determining the extent of the variance.").

Meadows's final arguments both concern his disagreement with the court's application of § 3553(a).  Prior to both sentencing hearings in this case, the parties extensively briefed and argued over the sentence each deemed appropriate.  During both hearings, the court heard argument from both attorneys, testimony from Meadows's victims, and testimony from Meadows himself.   The court recited the § 3553(a) factors and acknowledged that the recommended Guidelines range was merely a starting point.  The court then applied the individual factors to Meadows's case, and arrived at the 300-month sentence.  Given the district court's thorough consideration of the entire record, the sentence was not unreasonable.  Parker, 762 F.3d at 812.

## III. Conclusion

We find no procedural error because the district court properly applied the enhancements for sophisticated means and violation of securities law.  Further, the sentence imposed was substantively reasonable.  We therefore affirm Meadows's sentence.

_____