# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10381

United States Court of Appeals
Fifth Circuit

**FILED**

April 21, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

VINCENT BAZEMORE,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:12-CR-319-1

Before JOLLY, WIENER, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:*

Vincent Bazemore ("Bazemore") was convicted by a jury of four counts of mail fraud in violation of 18 U.S.C. § 1341 for his participation in a scheme to obtain commissions by inducing insurance companies to issue life insurance policies to unqualified applicants. The district court imposed a 24-level enhancement based on the intended loss of the scheme under U.S.S.G. § 2B1.1 and sentenced Bazemore to 292 months in prison. The district court also

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-10381

ordered Bazemore to pay $4,014,627.13 in restitution.  Bazemore appeals his conviction, sentence, and restitution order.  For the reasons that follow, we AFFIRM Bazemore's conviction but VACATE his sentence and restitution order and REMAND for resentencing.

## FACTS AND PROCEEDINGS

Bazemore's scheme involved tricking insurance companies into issuing stranger-owned (or originated) life insurance ("STOLI") policies to unqualified applicants.  In general, a life insurance policy will pay out a death benefit to the insured's beneficiaries when the insured dies, so long as the insured makes the required premium payments.  Wealthy individuals may take out large life insurance policies for estate planning purposes.  The proceeds of these policies are not taxed when they are transferred to the insured's heirs, and a wealthy senior can spend his assets on premium payments on the policy, which will, upon his death, pay out tax free to his beneficiaries.

A STOLI policy is a life insurance policy held by a third party that has no insurable interest in the insured.  The insurers that issued policies to Bazemore's applicants would, without exception, deny life insurance policies to applicants that intended from the outset to transfer the policy to a third party. To prevent the issuance of STOLI policies, the insurers' applications specifically asked whether the applicant intended to transfer the policy to a third-party investor.  The application further required applicants to state their net worth and whether the premiums would be financed by a third party, which would also indicate whether the policy was intended for an investor.

Bazemore, in his role as an insurance agent, convinced senior citizens of modest means, many of them relatives or family friends, to apply for multi-million dollar life insurance policies meant for high net-worth individuals. Bazemore promised these applicants that they would not have to pay anything out of pocket for the insurance, and after two years—when the contestability

2

No. 14-10381

period lapsed—he would sell the policy and pay them a lump sum. After securing a recruit, Bazemore would grossly inflate their net worth and income on the policy application and falsely claim that the applicant did not intend to transfer the policy to a third party. Bazemore did not, however, misrepresent the age or health status of an applicant. If a policy was issued, Bazemore would take out a loan to pay the premiums for the first two years, at which point he planned to sell the policy to an investor and use part of the proceeds to pay back the loan. As the agent responsible for the sale, he would receive a commission on each issued policy roughly equivalent to the cost of the first year's premium payment.

Bazemore was charged and convicted of four counts of mail fraud, each relating to a STOLI policy for which he received a commission payment. The district court calculated a guidelines range of 292 to 365 months' imprisonment based on an offense level of 39 and a criminal history category of II. The offense level was largely the product of a 24-point enhancement for the scheme's intended loss to the insurers, which the district calculated to be $81 million, the sum of the death benefits for all of the policies issued to Bazemore's applicants. The district court sentenced Bazemore to a 292-month term of imprisonment, 240 months for each count, to run partially concurrently and partially consecutively. The court also ordered Bazemore to pay $4,014,627.13 in restitution for the commissions paid to him by the insurers and for some of the notes issued by banks to finance the premiums.

Bazemore timely appealed his conviction, sentence, and restitution order.

## DISCUSSION

### I. Conviction

To support a mail fraud conviction under 18 U.S.C. § 1341, a jury must find: (1) a scheme to defraud a victim of money or property; (2) use of the mails

No. 14-10381

to execute that scheme; and (3) the specific intent to defraud.[1] *United States v. Lucas*, 516 F.3d 316, 339 (5th Cir. 2008); *United States v. Ratcliff*, 488 F.3d 639, 644 (5th Cir. 2007). To satisfy the "intent to defraud" element, the government "must prove that the defendant contemplated or intended some harm to the property rights of the victim." *United States v. Leonard*, 61 F.3d 1181, 1187 (5th Cir. 1995). "The government does not need to prove that the harm actually came about, however." *United States v. Loney*, 959 F.2d 1332, 1337 (5th Cir. 1992). "The [g]overnment must also prove that the scheme to defraud involved a materially false statement." *United States v. Harms*, 442 F.3d 367, 372 (5th Cir. 2006). "A statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *Id.*

Bazemore challenges his conviction on three grounds: (1) the commission payments were not "money or property" within the meaning of the mail fraud statute; (2) the McCarran-Ferguson Act prohibits federal prosecutions under the mail fraud statute for fraudulent procurements of life insurance policies; and (3) the prosecution in closing argument urged conviction on grounds prohibited by the jury instruction.

**A. Commission Payments**

Bazemore first argues that his conviction should be overturned because there was insufficient evidence from which the jury could have found that he intended to deprive the insurers of money or property. Tracking the indictment, the district court instructed the jury that, to find a scheme to defraud, the government must prove that Bazemore "intended to obtain substantial commissions by inducing life insurance companies to issue policies"

---

[1] The government did not charge Bazemore with "honest services" fraud under 18 U.S.C. § 1346.

to unqualified applicants. The district court stated that "[i]t is not sufficient for the [g]overnment to show that [ ] Bazemore created a scheme to obtain money at the expense of some person or party different than the insurance companies named in the indictment nor is it sufficient for the [g]overnment to show that [ ] Bazemore's conduct harmed these insurance companies in some way other than losing money by paying commissions to him."[2]    Bazemore argues on appeal that the object of a scheme to defraud must be property the victim would have lawfully possessed *but for* the defendant's actions. He reasons that, because the commission payments were the only loss the jury could consider, and the insurers always received premiums exceeding the cost of the commissions before they paid them, they were not deprived of any money or property.

Although Bazemore presents his challenge as one to the sufficiency of the evidence, it is really a claim that, as a matter of law, money a victim possesses only because of a fraudulent scheme does not constitute money or property for purposes of the mail fraud statute. We review this legal question de novo. *See Loney*, 959 F.2d at 1334.

Bazemore's but-for deprivation argument fails. As an initial matter, Bazemore's theory is premised on his assumption that a commission is paid entirely out of the "profits" of the first premium payment. But a commission is not paid in exchange for the first premium; it is not an isolated transaction in which the insurers simply give back some of the money Bazemore has given to them. The commission is paid to the agent in exchange for the sale of the policy and it is the liquidated value of a portion of that policy. In this sense

---

[2] The district court's instruction was flawed insofar as it suggested that the jury must find that the insurance companies were "harmed" by "losing money by paying commissions" to Bazemore. The mail fraud statute requires only intent to harm, not actual harm. Thus, while this portion of the instruction may be error, it is error that inured to Bazemore's benefit.

No. 14-10381

the commission is no different than the death benefits the insurer ultimately pays out; they are both costs that factor into the value of the product—the fact that the commission is paid up-front is immaterial. The commission payments were clearly money that legally belonged to the insurers.

Bazemore's argument that a scheme to defraud must involve money or property the victim would have possessed in the absence of the scheme also fails as a legal proposition. Following this logic, the mail fraud statute would not extend to a fraudulent scheme to induce a seller to sell a product at a discounted but still profitable price because the seller would not have made any profit at all but for the fraud. But "[s]uch a scheme, where the accused intends to gain money or property at the expense of the victim of the scheme, is clearly within the purview of § 1341." *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989); *see United States v. Ali*, 620 F.3d 1062, 1068 (9th Cir. 2010) (holding that Microsoft's "lost revenue when [its] products were sold at a discount as a result of [ ] fraud" was money or property under the mail fraud statute); *Stewart*, 872 F.2d at 960 (holding that a scheme "to deprive [ ] manufacturers of money which they should have received on sales of pharmaceuticals" by tricking the manufacturers into selling drugs at reduced prices was a "scheme relating to property rights"). Accordingly, Bazemore's contention that a mail fraud scheme does not deprive a victim of money or property so long as the victim earns some profit from the scheme is unpersuasive.

The insurers paid Bazemore millions of dollars in commissions for value they did not receive: insureds that met their qualifications. Those commission payments were unquestionably money or property under the mail fraud statute.

6

No. 14-10381

## B. McCarran-Ferguson Act

Bazemore next contends that the district court erred by refusing to dismiss his indictment because his federal prosecution is reverse preempted by Texas insurance law under the McCarran-Ferguson Act. "We review the sufficiency of an indictment de novo, taking the indictment's allegations as true." *Ratcliff*, 488 F.3d at 643.

The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). "[A] state law reverse preempts federal law only if: (1) the federal statute does not specifically relate to the business of insurance; (2) the state law was enacted for the purpose of regulating the business of insurance; and (3) the federal statute operates to invalidate, impair, or super[s]ede the state law." *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 493 (5th Cir. 2006) (internal quotation marks omitted). "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Bazemore makes two related claims as to why the use of the federal mail fraud statute to prosecute misrepresentations in life insurance applications would "invalidate, impair, or supersede" Texas insurance law. First, he contends that the definition of materiality in the mail fraud statute is broader than the definition of a material misrepresentation that would permit an insurer to void a life insurance policy within the contestability period. *See* Tex. Ins. Code Ann. § 705.051 (providing that a misrepresentation only defeats recovery under a policy if it "affects the risks assumed" by the insurer). Second,

7

he alleges that the five-year limitations period to bring a mail fraud prosecution would displace the two-year state incontestability period because it would permit the insurer to recover any payout of the policy through restitution.

Bazemore's arguments fail. With regard to the first, it is immaterial that a criminal prosecution for fraud could be commenced even if the policy procured by the fraud could not be defeated by the insurer. The federal prosecution would have no effect on the operation of the state law. As to Bazemore's concern that an insurer could effectively rescind a policy beyond the contestability period through court-ordered restitution, it has nothing at all to do with a *conviction* for fraud, but rather a possible consequence of the conviction. Moreover, Bazemore overlooks that the state statutes he claims are impaired by his federal prosecution protect policyholders and their beneficiaries, of which he is neither. *See Humana*, 525 U.S. at 310 ("[W]hen *application* of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." (emphasis added)). Accordingly, there is no plausible argument that Bazemore's prosecution under the mail fraud statute violates the McCarran-Ferguson Act.

### C. Closing Statement

Bazemore's final challenge to his conviction is premised on remarks made by the prosecution at closing argument. The district court instructed the jury that it could not convict Bazemore unless it found that he created a scheme to obtain commission payments from the insurers and that no other victim or theory of deprivation would suffice. Bazemore claims that three remarks in the prosecution's closing suggested conviction on impermissible grounds: (1) certain insurers were harmed because they paid commissions but canceled the STOLI policies and refunded premiums; (2) Bazemore's misrepresentations

induced one of the insurers to issue an $8 million policy; and (3) one of the applicants incurred attorneys' fees as a result of his fraud.  Because Bazemore did not object to the prosecutor's comments at trial, we review his claim for plain error.  *See United States v. Aguilar*, 645 F.3d 319, 323 (5th Cir. 2011).

Bazemore's objections to the first two comments fail at the outset because they do not contravene the jury instructions.  Bazemore was charged with deceiving insurers into issuing expensive life insurance policies so that he could obtain commissions on those policies and the jury was instructed that they must find such a scheme existed.  These remarks relate directly to the charged and instructed scheme.  In any case, Bazemore must show, *inter alia*, that "the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."  *United States v. Gracia*, 522 F.3d 597, 603 (5th Cir. 2008) (internal quotation marks omitted).  Bazemore argues that the government could not have secured his conviction without the supposedly improper closing remarks because the evidence at trial showed that the commissions were not money or property under the mail fraud statute, so the jury must have relied on one of the allegedly impermissible theories of deprivation suggested in the government's closing.  As explained, Bazemore's contention that the commissions were not money or property because they were paid after receipt of the first premium is meritless.  Because that claim fails, so too does this one.  Bazemore concedes that his misrepresentations induced the insurers to issue policies to unqualified insureds and pay him commissions on those policies.  Any improper comment by the prosecution would not cast doubt on the verdict.

**II. Sentencing**

Bazemore also challenges the 24-level enhancement the district court applied based on an intended loss of $81 million, the combined value of the death benefits of the policies the insurers issued to Bazemore's applicants. The district court calculated a criminal history category of II and a total offense

level of 39 based on: (1) a base offense level of 7 for the mail fraud convictions; (2) a 24-level increase for an intended loss of $81 million; (3) a 2-level enhancement for use of sophisticated means; (4) a 4-level enhancement for Bazemore's role as an organizer of the fraud; and (5) a 2-level enhancement for abusing a position of private trust.  The resulting guidelines range was 292 to 365 months, and the district court sentenced Bazemore to 292 months' imprisonment.

"A district court's sentencing decision is reviewed for abuse of discretion." *United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010).  "However, the district court's interpretation or application of the Sentencing Guidelines is reviewed de novo, and its factual findings are reviewed for clear error."  *Id.* (internal quotation marks and alteration omitted).  The district court's method of calculating loss is an application of the guidelines that we review de novo. *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008).  The amount derived from the calculation is a factual finding reviewed for clear error.  *Id.*

The district court erred in using the face value of the insurance policies to calculate the intended loss of Bazemore's scheme.  Under U.S.S.G. § 2B1.1, the offense level assigned to a fraud conviction depends upon the amount of loss inflicted on the victim or intended by the defendant.  The loss figure used to determine the enhancement is "the greater of actual or intended loss." U.S.S.G. § 2B1.1 app. n. 3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* § 2B1.1 app. n. 3(A)(i). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense."  *Id.* § 2B1.1 app. n. 3(A)(ii).  The government must "prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level."  *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003).  Subjective intent, however, may be inferred from a defendant's recklessness.  *Harris*, 597 F.3d at 255.

No. 14-10381

The government argues that the intended loss of the scheme is the total amount of the death benefits obtainable under the policies—$81 million—because that was "the dollar amount placed at risk" by Bazemore's fraud. *See United States v. Oates*, 122 F.3d 222, 225 (5th Cir. 1997). As this court has explained, however, determining intended loss by the maximum value of a financial product is proper only "under certain factual circumstances." *Harris*, 597 F.3d at 252; *see id.* at 251-56 (discussing instances in which intended loss was calculated as the dollar amount placed at risk by a scheme). The government argues that fraudulently-obtained life insurance policies fall within this ambit because such policies are analogous to fraudulently-obtained loans, for which we have found that the intended loss is the full amount of the loan when the defendant is "consciously indifferent or reckless" as to whether the fraudulently obtained funds can be repaid. *See United States v. Morrow*, 177 F.3d 272, 301 (5th Cir. 1999).

We reject the government's analogy. There is an obvious difference in the financial risk presented by a fraudulently-procured loan and the STOLI policies at issue here. The proceeds of a loan are extended to the borrower up-front, and thus the risk of non-payment exposes the lender to a loss of the total amount of the loan. But a life insurance policy lapses in the event of non-payment, in which case the insurer is entitled to retain the premiums paid until that point and has no obligation to pay out death benefits when the insured dies. Thus, whereas the risk to a lender is non-payment on the loan, the primary risk to an issuer of a fraudulently-induced life insurance policy is that an insured will die more quickly than anticipated by the actuarial model, forcing the insurer to pay death benefits before receiving the expected amount

11

of premiums.[3]  Because the insurers would not be responsible for paying the death benefits unless compensatory premium payments continued to be made until the death of the insured, it is inappropriate to use the face value of the loans as the intended loss.[4]

The correct way to calculate the intended loss, if any, of Bazemore's scheme presents a more difficult question.  At a minimum, the intended loss figure must account for the premium payments Bazemore intended the policyholder to make to keep the policy in place until the insured died and death benefits could be paid.  This is the formula the Eighth Circuit approved in *United States v. Jenkins.  See id.*, 578 F.3d 745, 749-50 (8th Cir. 2009) (holding that the intended loss to insurers of a scheme to fraudulently obtain insurance policies was the face value of the death benefits of the policies minus an estimate of the premiums the schemers intended to pay).  In that case, however, the defendants misrepresented the age and health condition of many of the applicants, and it was actually "likely that they would die soon after the fraudulently-obtained policies were issued." *Id.* at 750.

The government's own argument reveals the infirmity of that approach to the STOLI policies at issue here.  The government reasons that the intended loss should be the full face value of the policies because the "the insured would have had to have lived for 20 to 30 additional years" for the yearly premiums to catch up with the value of the death benefits.  The flaw in this logic, of course, is that the insurers issued the policies under the belief that the

---

[3] There may be other, more immediate financial consequences to insurers due to premium payments being made by institutional investors instead of individual policyholders, but the government has not identified any.

[4] It is immaterial that a third-party investor would take over the premium payments after the contestability period terminated and Bazemore sold the policy.  The current policyholder would still have to make the requisite premium payments to prevent the policy from lapsing.

applicants' representations were truthful—that is the very point of this prosecution.  Put another way, the death benefits and premium costs were calculated based on the qualifications of the applicants the insurers thought they were getting.  So, even if the applicants were as wealthy as they represented themselves to be, they would still have had to live to be centenarians for the insurers to make a profit under such a crude financial analysis.  Accordingly, simply subtracting the intended premium payments from the death benefits would create a false positive: a legitimate policy would show an intended loss because the premiums paid over the course of the insured's expected lifetime would not reach the face value of the policy.

To apply the intended loss enhancement, the government has the burden to prove by a preponderance of the evidence that Bazemore intended pecuniary harm to result from his scheme.  *See Sanders*, 343 F.3d at 527; U.S.S.G. § 2B1.1 app. n. 3(A)(ii).  This requires the government to establish that the STOLI policies imposed a *financial* risk to the insurers beyond the risk they believed they were receiving in issuing life insurance to Bazemore's applicants.  To be sure, the government proved that the insurers paid Bazemore commissions for value they were promised but did not receive in the form of qualified insureds— namely, insureds who met the insurers' net worth requirement and who did not intend to transfer their policies to third-party investors. While this is sufficient to satisfy the mail fraud statute, it is not sufficient to prove that Bazemore intended pecuniary harm to result from the offense.[5]

---

[5] A misrepresentation is material under the mail fraud statute if it "has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed."  *Lucas*, 516 F.3d at 339 (internal quotation marks omitted); *see also Neder v. United States*, 527 U.S. 1, 22 n.5 (quoting the Restatement (Second) of Torts § 538, for the proposition that a statement is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action" or "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable

No. 14-10381

The government concedes that Bazemore did not misrepresent the age or health status of his applicants. Therefore, to prove intended loss, it must prove that his misrepresentations as to the applicants' financial status and third-party financing arrangements posed a risk of financial harm to the insurers that would not have existed if the information provided in the insurance applications were true. The government has not attempted to make this showing, let alone quantify any purported economic harm. We accordingly VACATE Bazemore's sentence. On remand, an intended loss enhancement cannot be applied unless the government proves by a preponderance of the evidence that the STOLI policies posed a risk of financial loss to the insurers that the same policies issued to qualified insureds—the applicants the insurers thought they were getting—did not.

Finally, the government contends that any error in applying an intended loss enhancement was harmless because the district court stated that it would have imposed the same sentence regardless of whether it incorrectly applied the enhancement. A district court's error in the guidelines calculation is harmless if the government "convincingly demonstrates both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *United States v. Richardson*, 676 F.3d 491, 511 (5th Cir. 2012) (internal quotation marks omitted). "This is a heavy burden, and one that requires the proponent to point to evidence in the record that will convince the appellate court that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error." *Id.* (internal quotation marks and alteration omitted).

---

man would not so regard it"). Bazemore concedes that his misrepresentations were material in that the insurers would not have issued the STOLI policies had the applications been truthful.

No. 14-10381

The government cannot meet this heavy burden.  The district court sentenced Bazemore to the lowest end of the miscalculated guidelines range. The court stated that the lengthy sentence was necessary because his scheme was a "massive fraud."  This determination of the scale of the fraud was necessarily based on the district court's conclusion that Bazemore intended to cause an $81 million loss.  Because the government did not offer any evidence of financial loss at all, we remand the case to the district court for resentencing in light of our holding as to the required showing for an intended loss enhancement.

## III. Restitution

The district court ordered Bazemore to pay $4,014,627.13 pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  "This court reviews the legality of a restitution order de novo.  If the restitution order is legally permitted, the order is reviewed for an abuse of discretion." *United States v. Taylor*, 582 F.3d 558, 565 (5th Cir. 2009) (internal citation omitted). "The burden of proof is on the government to demonstrate by a preponderance of the evidence the amount of loss sustained by a victim. The MVRA does not permit restitution awards to exceed a victim's loss." *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006) (internal citation omitted).

The presentence report ("PSR") recommended restitution in the amount of $4,558,416.13 and the district court adopted the figure, save for the removal of commission payments not induced by the scheme to defraud.  The PSR calculated the actual losses to the insurers as the commissions paid to Bazemore based on its determination that, "[w]hen the fraud was discovered, the insurance companies revoked the policies and remitted the paid premiums to the lenders."

"[T]he district court is entitled to rely upon the information in the PSR as long as the information bears some indicia of reliability." *United States v.*

15

*Scher*, 601 F.3d 408, 413 (5th Cir. 2010).  Before sentencing, the government informed the district court that it could not support some of the loss amounts specified in the PSR because certain insurers had retained the premiums they received or had not verified their losses.  The government agreed with Bazemore that paid premiums should be offset against commissions and argued that the amounts it identified should not be ordered as restitution.  The district court evidently ignored both Bazemore's and the government's objections to the PSR.

On appeal, the government contends that the restitution order should stand because Bazemore did not carry his "burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue."  *Id.*  It is unclear why the government now advocates for an award it previously argued was inappropriate.  In any case, the defendant's burden of rebutting inaccurate information in the PSR is satisfied where the government elects to do it for him.  The actual loss on a rescinded STOLI policy is the commission the insurer paid to Bazemore less any premium payments that it retained.  Accordingly, we VACATE the order of restitution.

## CONCLUSION

For the foregoing reasons, we AFFIRM Bazemore's conviction but VACATE his sentence and restitution order and REMAND the case for proceedings consistent with this opinion.