REVISED October 24, 2016

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10805

United States Court of Appeals
Fifth Circuit

**FILED**

October 05, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

VINCENT BAZEMORE,

      Defendant - Appellant

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before KING, SMITH, and COSTA, Circuit Judges.

PER CURIAM:

Defendant–Appellant Vincent Bazemore was convicted of mail fraud for his part in a scheme to procure life insurance policies by misrepresenting the applicants' net worths and their intention to transfer the policies to a third party. This court previously affirmed Bazemore's conviction but vacated his sentence and the restitution order. On remand for resentencing, the district court applied an 18-level enhancement to Bazemore's base offense level due to the actual loss caused by Bazemore's scheme to insurers and a lender. Bazemore again appeals his sentence, raising several challenges to the district

court's application and calculation of the actual loss enhancement. For the following reasons, we AFFIRM the district court's sentence in full.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of an insurance fraud scheme perpetrated by Defendant–Appellant Vincent Bazemore. In resolving Bazemore's original appeal, we described the scheme and procedural history in detail, *United States v. Bazemore (Bazemore I)*, 608 F. App'x 207, 209 (5th Cir. 2015), and we now recount the scheme and procedural history as relevant to the sentencing question before us today. "Bazemore's scheme involved tricking insurance companies into issuing stranger-owned (or originated) life insurance ("STOLI") policies to unqualified applicants."[1] *Id.* Bazemore first convinced senior citizens of relatively modest means to apply for multi-million dollar life insurance policies intended for high net-worth individuals. *Id.* Bazemore secured the policies by grossly inflating the applicants' net worths on the policy applications and falsely claiming that the applicants did not intend to transfer the policy to a third party[2] and that the premiums would not be financed by a third party. *Id.* However Bazemore did not misrepresent the applicants' age or health status on any application. *Id.* Bazemore paid the first two years of the policy premiums using loan proceeds from a lender, Portigon AG,[3] at which point he planned to sell the policy to a third party investor, use the proceeds to

---

[1] STOLI policies are life insurance policies held by a third party who has no insurable interest in the insured. *Bazemore I*, 608 F. App'x at 209. As discussed in Bazemore's presentence report ("PSR"), "STOLI policies are not illegal; however they circumvent state insurable interest laws and are inconsistent with the established and legitimate purposes of life insurance."

[2] "The insurers that issued policies to Bazemore's applicants would, without exception, deny life insurance policies to applicants that intended from the outset to transfer the policy to a third party" who had no insurable interest in the insured. *Id.*

[3] Although the loan proceeds originated with Portigon, the First Bank of Delaware actually issued the loans to Bazemore because Portigon did not have a retail license to make direct loans.

repay the loan, and share the remainder with the applicant. *Id.* After each policy issued, Bazemore, in his role as an insurance agent, received a commission roughly equivalent to the cost of the first year's premium. *Id.*

As a result of this scheme, "Bazemore was charged and convicted of four counts of mail fraud, each relating to a STOLI policy for which he received a commission payment." *Id.* at 209–10. At Bazemore's first sentencing, "[t]he district court calculated a [G]uidelines range of 292 to 365 months' imprisonment based on an offense level of 39 and criminal history category of II." *Id.* at 210. "The offense level was largely the product of a 24-point enhancement for the scheme's intended loss to the insurers, which the district calculated to be $81 million, the sum of the death benefits for all of the policies issued to Bazemore's applicants." *Id.* The district court also calculated that Bazemore owed restitution of $4,014,627.13. *Id.* That figure was the sum of two distinct amounts: (1) an actual loss of $2,266,665.13 suffered by insurers who paid commissions to Bazemore, and (2) an actual loss of $1,747,962 suffered by Portigon. *Id.* Based on these findings, the district court sentenced Bazemore to 292 months' imprisonment and ordered restitution of $4,104,627.13. *Id.*

Bazemore appealed his conviction, sentence, and restitution order. *Id.* The court affirmed Bazemore's conviction but vacated his sentence and the restitution order. *Id.* at 217. As to his sentence, the court found that the district court erred in using the sum face value of the insurance policies—$81 million—to calculate the intended loss from Bazemore's scheme. *Id.* at 213–14. The court noted that Bazemore made no misrepresentation as to the applicants' age or health status and this mitigated some of the potential harm from the fraud. *Id.* at 214–16. Accordingly, it concluded that the district court could not apply an intended loss enhancement based on the $81 million sum

face value unless the Government proved by a preponderance of the evidence that the fraudulent policies posed a risk of financial loss to the insurers that the same policies issued to qualified insureds did not. *Id.* at 216. As to the restitution order, the court found that the district court incorrectly calculated the actual loss amounts suffered by the insurers. *Id.* at 217. The court instructed that the formula to use for actual loss on a rescinded STOLI policy (in the restitution context) on remand was "the commission the insurer paid to Bazemore less any premium payments that it retained." *Id.*

On remand, the probation officer issued an addendum to the presentence report ("PSR"), concluding that actual loss, rather than intended loss, should be used to calculate the loss enhancement at resentencing. For purposes of the loss enhancement, the PSR calculated a total actual loss of $1,282,636 to the insurers targeted by Bazemore, using the formula described by the court in *Bazemore I* (commissions paid by the insurers less any premium payments they retained). *Id.* at 216–17. The PSR also calculated an actual loss of $1,747,962 to the lender, i.e., the same loss calculated by the district court for Portigon at Bazemore's first sentencing. But the PSR noted that Portigon transferred its loan and securities portfolio to EAA PF LLP in January 2015, so EAA replaced Portigon as the victim of Bazemore's scheme.[4]

---

[4] Through a complicated series of transactions, the details of which are not relevant to the issues in this appeal, EAA has assumed what appears to be an identical role to that previously held by Portigon and now possesses the interest in the loans originally used to finance Bazemore's insurance fraud scheme. Specifically, Portigon during the first sentencing (and EAA during the resentencing) held the interest in thirteen insurance premium loans. At the time of the first sentencing, nine of the loans were inactive either because (1) the insurer had rescinded the underlying life insurance policy and refunded the premium, resulting in Portigon recovering the loan proceeds, interest, and fees; (2) Portigon had reached agreements with the policyholders for repayment of the loans, resulting in Portigon recovering most, but not all, of the loan proceeds; or (3) the insurance policies had lapsed for failure to pay the premiums, resulting in Portigon's failing to recover any of the loan proceeds. Four of the loans, however, remained active and were still being used to pay the premiums on their related life insurance policies.

On August 17, 2015, the district court held Bazemore's resentencing hearing. The district court adopted the PSR's calculation of actual loss to the insurers, finding they suffered a total actual loss of $937,612.[5] The district court then calculated the actual loss to Bazemore's lender. Looking to Fifth Circuit caselaw, the court found that actual loss should be calculated "at the time of the original sentencing," thereby ignoring Portigon's transfer of the loans (and its related security interest in the insurance policies) to EAA because the transfer occurred after the first sentencing. The district court included only the nine loans that had been rescinded, settled, or lapsed in calculating the lender's total actual loss of $1,747,962. The district court did not include any actual loss for the four loans related to active policies, noting that the Government stated that any loss for those loans was "speculative."

Because the loss to the insurers and the lender combined for a total actual loss of $2,685,574, the district court applied an 18-level enhancement. *See* U.S. Sentencing Guidelines Manual § 2B1.1(b) (U.S. Sentencing Comm'n 2012) (providing for an 18-level enhancement for offense causing losses between $2.5 and 7 million). The district court calculated a Guidelines range of 151 to 188 months' imprisonment based on a total offense level of 33 and a criminal history category of II. Similar to the first sentence, Bazemore's offense level was largely the product of the loss enhancement. The court sentenced Bazemore to 188 months' imprisonment, ordered restitution in the amount of $2,685,574, and further explained that it would have imposed the same sentence even if it had not overruled Bazemore's objections. Bazemore timely appeals the actual loss enhancement to his base offense level.

---

[5] The district court excluded the actual loss suffered by one of the insurers because the evidence of that loss was incomplete at the time of the first sentencing.

## II.   THE ACTUAL LOSS CALCULATION

### A. The law of the case doctrine and the mandate rule

On appeal, Bazemore argues, as he did before the district court, that the district court erred in applying a loss enhancement based on a finding of actual loss because both the law of the case doctrine and the mandate rule compelled a finding of zero actual loss.  Under the law of the case doctrine, "an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (quoting *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002)).  "[A] corollary or specific application of the law of the case doctrine" is the mandate rule.  *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006) (per curiam).  That rule "prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court on remand." *Id.*  "Moreover, the [mandate] rule bars litigation of issues decided by the district court but foregone on appeal or otherwise waived, for example because they were not raised in the district court." *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004).  Accordingly, a district court cannot "reconsider its own rulings made before appeal and not raised on appeal."  18B Charles Alan Wright et al., *Federal Practice and Procedure* § 4478.3 (2d ed. 2016).  Both the law of the case doctrine and the mandate rule apply to issues decided expressly or implicitly. *See Pineiro,* 470 F.3d at 205; *Lee,* 358 F.3d at 320.  "We review *de novo* a district court's application of the remand order, including whether the law-of-the-case doctrine or mandate rule forecloses the district court's actions on remand." *United States v. Carales–Villalta,* 617 F.3d 342, 344 (5th Cir. 2010); *accord Pineiro,* 470 F.3d at 204.

Bazemore's argument rests on two objections that he made at his first sentencing. In these objections Bazemore argued that (1) actual loss to the insurers for the commissions they paid Bazemore should be calculated based on losses to the insurers rather than gains to Bazemore because gains should only be used as an alternative measure of loss when loss could not be determined (Objection No. 2); and (2) any actual loss suffered by the insurers in entirely refunding the premiums was not "reasonably foreseeable" to Bazemore and thus "there was no actual loss in this case" (Objection No. 3). In addressing the two objections the district court stated:

> With respect to Mr. Bazemore's Objection No. 2 that commission payments were not losses to the insurance company, . . . .
> [Guidelines] Application Note 3(B) defines gain and [says that gain] applies as an alternative measure of loss only if there is a loss but it reasonably cannot be determined. Mr. Bazemore says you should not be able to use gain [as a measure of the loss he caused] . . . under Application Note 3(B) when you can ascertain the loss . . . .
> I will sustain Mr. Bazemore's objection to this figure [i.e., the gains to Bazemore from commissions]. But I will note that it does not change the loss amount. That means I will not include this figure in the loss amount under Mr. Bazemore's Objection No. 3.

Bazemore argues that the district court's rulings on these objections show that it found zero actual loss for purposes of determining a loss enhancement, and because the Government failed to appeal these rulings, the finding was binding at resentencing and precluded an actual loss enhancement to his sentence.

As an initial matter we note that both of these objections were limited to the calculation of actual loss suffered by the *insurers*, and did not involve the actual loss to the lender, Portigon. Indeed, calculation of actual loss suffered by Portigon was not added to the PSR until after Bazemore made these objections. There is no indication in the record that Bazemore filed an objection

to the actual loss calculation as to Portigon during his first sentencing. During the first sentencing, the district court did not make any factual findings regarding the lender's actual loss for the purposes of a loss enhancement and therefore the law of the case doctrine did not dictate any outcome with respect to this loss at resentencing.

With respect to the district court's findings on the insurers' actual loss, we conclude that neither the law of the case doctrine nor the mandate rule required a finding of zero actual loss by the insurers at resentencing. The district court, in responding to Bazemore's objections, did not make a factual finding on the actual loss *amount*. Rather, it made a factual finding regarding *how* the insurer's actual loss could be calculated. The district court's statement that it would "not include this figure [i.e., the gains to Bazemore from commissions] in the [insurers'] loss amount" did not involve an expansive finding that there was no actual loss at all. Furthermore, as the district court recognized, sustaining Bazemore's objection to the actual loss calculation method "d[id] not change the loss amount" because the district court ultimately used intended loss, not actual loss, to calculate the loss enhancement. *See* U.S. Sentencing Guidelines Manual § 2B.1.1 cmt. n.3(A) (providing that the greater of actual loss or intended loss should be used for determining the loss enhancement). And the district court did not address Bazemore's reasonable foreseeability objection during the hearing, which was the only objection where Bazemore contended that actual loss should be zero. In the cursory discussion that Bazemore cites, the district court did not make any implicit finding regarding the amount of actual loss for the loss enhancement, let alone a finding of zero actual loss. Thus, the district court was not bound by the law of the case doctrine or the mandate rule at resentencing to find zero actual loss to the insurers for purposes of the loss enhancement. *See Lee*, 358 F.3d at 321

(noting that "the [mandate] rule bars litigation of issues *decided* by the district court" (emphasis added)); *see also* Wright et al., *supra,* at § 4478 ("Actual decision of an issue is required to establish the law of the case. Law of the case does not reach a matter that was not decided." (footnote omitted)).

## B. Bazemore's actual loss enhancement

The Guidelines provide for a tiered enhancement to the base offense level depending on the dollar amount of loss relating to a defendant's offense. U.S. Sentencing Guidelines Manual § 2B1.1(b). The Guidelines define "loss" as "the greater of actual loss or intended loss." *Id.* § 2B.1.1 cmt. n.3(A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. n.3(A)(i). To be "reasonably foreseeable," the harm must be "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* § 2B1.1 cmt. n.3(A)(iii)–(iv). In calculating the amount of loss for purposes of the enhancement, the district court "need only make a reasonable estimate of the loss." *Id.* § 2B1.1 cmt. n.3(C). We recognize that the district court is "in a unique position to assess the evidence and estimate the loss based upon that evidence," *id.*, and accordingly we give the district court's loss determination "wide latitude." *United States v. Taylor*, 582 F.3d 558, 564 (5th Cir. 2009) (per curiam) (quoting *United States v. Brewer*, 60 F.3d 1142, 1145 (5th Cir. 1995)).

Bazemore challenges several aspects of the district court's actual loss determination. We review "the district court's *method* of determining the amount of loss, as well as its interpretation of the meaning of a sentencing guideline, *de novo*." *United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016) (quoting *United States v. Nelson*, 732 F.3d 504, 520 (5th Cir. 2013)). After determining that the method of calculation is "legally acceptable," *United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005), we review the embedded

factual findings—such as whether the loss amount was reasonably foreseeable or resulted from the offense—for clear error, *United States v. Brown*, 727 F.3d 329, 341 (5th Cir. 2013); *United States v. Valdez*, 726 F.3d 684, 696 (5th Cir. 2013). "We will uphold a district court's factual finding on clear error review so long as the enhancement is plausible in light of the record as a whole." *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006).

Bazemore alleges the district court committed three distinct errors in calculating his loss enhancement: (1) the district court failed to consider Portigon's transfer of its interest to EAA; (2) the district court failed to include potential profits to the lender from the loans on currently active policies; and (3) the district court erroneously found that the losses to the insurers and the lender were reasonably foreseeable harms that resulted from Bazemore's fraud. In response the Government argues that any challenge to the actual loss suffered by the lender was waived and that the challenges to the actual loss suffered by the insurers lack merit.[6] We first address the issue of waiver and then proceed to the merits of each of the errors alleged by Bazemore.

1. *Waiver*

As an initial matter, the Government argues that Bazemore waived any challenge to the actual loss suffered by the lender because he challenged only the loss calculation as to the *insurers* in his original appeal. On remand the district court may not consider issues "which could have been brought in the original appeal" but were not. *United States v. Griffith*, 522 F.3d 607, 610 (5th Cir. 2008) (emphasis omitted) (quoting *Lee*, 358 F.3d at 323). At the first sentencing the district court adopted the factual findings of the PSR, which included a finding of a $1,747,962 actual loss to Portigon for the purposes of

---

[6] The Government also argues that any error in calculating the loss enhancement was harmless. But because we find no such error, we do not address this argument further.

restitution. Bazemore did not appeal this specific finding of actual loss; he appealed only the district court's findings of actual loss relating to the insurers. *See Bazemore I*, 608 F. App'x at 216–17 (vacating the district court's order of restitution, concluding that the district court had improperly calculated the actual loss suffered by insurers). But we disagree that this resulted in waiver. While Bazemore did not challenge the Portigon actual loss finding, the PSR expressly recognized that finding was "for restitution purposes." The "'loss' for determining the offense level is different from the 'loss' for restitution purposes." Robert W. Haines, Jr., et al., *Federal Sentencing Guidelines Handbook* 1556–57 (2015–2016 ed.) [hereinafter *Sentencing Handbook*]; *see also United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010) ("While the Mandatory Victims Restitution Act . . . requires a judge to order restitution to compensate the full amount of each victim's losses . . . it does not require restitution to match the loss figure used for sentencing. Indeed, the amounts of loss and restitution can and do differ." (citations omitted)). And the district court did not make any findings during the first sentencing on actual loss suffered by Portigon for the purposes of determining the loss enhancement. Bazemore therefore had "no reason" to challenge the actual loss suffered by the lender in his original appeal. *Lee*, 358 F.3d at 324. His failure to do so did not result in waiver.

   *2. Portigon's transfer of interest to EAA*

Bazemore contends that the district court erred at resentencing in finding that the lender suffered an actual loss. He notes that after his first sentencing, EAA purchased Portigon's interest in the policies and argues that this sale demonstrates that Portigon was fully reimbursed for its loans to Bazemore and therefore suffered no actual loss. He also contends that EAA did not suffer any harm from his scheme—and therefore had no actual loss—because it was fully

informed about the fraudulent nature of the loans when it purchased the interest in the policies from Portigon. He disagrees with the district court's finding that actual loss is determined at the time of the first sentencing, and instead contends that because Portigon had recouped all of its losses by his resentencing and EAA was not harmed, there was no actual loss to the lender. Finally he argues that Portigon's subsequent sale of its interest in the policies provides the best estimate of the policies' value and the loss enhancement should therefore reflect the sale because that value existed at the time of the first sentencing.

We conclude that the district court did not err when it calculated the actual loss caused by Bazemore's scheme based on the time of his first sentencing. The Guidelines provision containing the tiered enhancement for actual loss, U.S. Sentencing Guidelines Manual § 2B1.1, "contains no general time of measurement rule." *Sentencing Handbook*, *supra*, at 369. The Guidelines do contain some specific time of measurement rules for applying certain credits against a loss amount, *see, e.g.*, U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(E)(i)–(ii), but lack any direction as to "*when* [actual] loss should be measured," *Sentencing Handbook*, *supra*, at 368. Because no general time of measurement rule exists, the district court relied on our decision in *United States v. Goss*, 549 F.3d 1013 (5th Cir. 2008), to find that actual loss should be measured at the time of the first sentencing. In *Goss*, this court explained that "focusing on the [fair market value of the collateral] at the *time of the initial sentencing* best comports with the [G]uidelines' plain language." *Id.* at 1019 (emphasis added); *see also* U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(E)(ii) (providing that the value of collateral is measured "at the time of sentencing"). *Goss* reasoned that first sentencing should be the time of measurement because a defendant "should be neither

penalized nor rewarded for whatever effects the time spent on appeal . . . may have on the fair market value of the collateral." *Goss*, 549 F.3d at 1019.

While the court in *Goss* dealt with valuation of collateral for purposes of determining the credits against loss, the court's concern about the potential effects of changes in market value is just as relevant to the determination of actual loss. If the actual loss amount resulting from Bazemore's insurance fraud scheme was not determined at the time of the first sentencing, Bazemore would be (fortuitously) "rewarded" with a reduced actual loss amount for no other reason than "the time spent on appeal." *Id.* Moreover, while the court in *Goss* did not establish a "blanket rule," *id.*, measuring the actual loss amount at the time of the first sentencing does not run contrary to any provision in the Guidelines, *see Sentencing Guidelines*, *supra*, at 369 (noting that "the current [G]uideline contains no general time of measurement rule"). Thus, the district court's method of calculating actual loss based on the time of the first sentencing is "legally acceptable." *Olis*, 429 F.3d at 545. Bazemore's argument that the sale of the collateral to EAA provides insight into the actual loss amount at the time of the first sentencing is therefore unavailing because that sale occurred subsequent to the first sentencing. The district court therefore did not err when it declined to factor Portigon's sale of its portfolio to EAA into its actual loss calculation and instead calculated the actual loss amount based on the time of the first sentencing.

*3. Profits from active policy loans*

Bazemore next argues that the district court erred by failing to offset losses to the lender with any profits that may arise from loans on policies that are still active. The district court, in calculating actual loss on the loans held by the lender, only included the actual loss for the nine loans related to inactive life insurance policies. The district court excluded from the actual loss

calculation any actual loss for the four loans on active policies, i.e., the policies on which the lender was still paying premiums and could recover the loan proceeds "if and when the death benefit [on the policy] is paid." While the district court did not explain why those active polices were excluded from the calculation, the court did note that the Government had excluded the active policy loans from its proposed actual loss calculation as "speculative."

We conclude that the district court did not err by failing to include these potential profits in its actual loss calculation for the lender. The Guidelines require only that the district court make a "*reasonable estimate* of the loss" based on the information available to it. U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(C) (emphasis added). Determining what future gains are likely to be earned on active policy loans, or whether any gains are likely at all, is a necessarily speculative task. Whereas the actual loss for inactive policy loans can be calculated with reasonable precision and certainty, gains for active policy loans, if any, are difficult to calculate and likely to change in the future. The Second Circuit recently addressed how to calculate similarly uncertain loan outcomes in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015). In *Binday* the district court calculated actual loss from a similar insurance scheme based on the commissions and death benefits paid under the STOLI policies, reduced by the premiums received by insurers on policies where "the outcome [was] known," i.e., the actual loss figure did not include any active policies "except to consider the commission defendants received on those policies." *Id.* at 596. On appeal, the Second Circuit held that this method of calculating actual loss was reasonable because the "'actual' gain or loss" could be calculated only for "[t]he policies for which the results [we]re already known," not for active policies where gains or losses were a mere "possibility." *Id.* at 598.

Similarly, the only actual gains or losses from Bazemore's scheme which are known with reasonable certainty are the losses related to the inactive policy loans. While Bazemore contends that the lender could potentially profit from the active policy loans because the death benefits could be greater than the premiums paid, Bazemore has provided little support for this contention beyond his own speculation. And, as the Government correctly notes, the evidence in the record speaks only to potential future recoupment of the loan proceeds plus interest and fees, not of potential profit. For example the FBI report summarizing an interview with Portigon representatives explains that "Portigon has a secured interest in the policies and could recover the loan proceeds if and when the death benefit is paid." Another report states that Portigon representatives acknowledge that Portigon has a security interest in active policies involved in the schemes but cautions "it is uncertain whether making the premium payments through maturity will be beneficial because it is uncertain whether the insurance company will honor these policies, due to [Bazemore's] fraudulent actions." Thus, the potential profits urged by Bazemore on the active policy loans appear to be, at best, only a "possibility." *Binday*, 804 F.3d at 598. We conclude that the district court's decision to base its actual loss calculation solely on the inactive policy loans was a "reasonable estimate of the loss" based on the information available to the court. U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(C).

*4. Reasonable foreseeability of the actual losses*

Finally, Bazemore contends that the district court erred in finding that actual losses to the insurers and the lender were a reasonably foreseeable result of Bazemore's scheme. The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. n.3(A)(i). This definition "incorporates [a] causation standard

that, at a minimum, requires factual causation . . . and provides a rule for legal causation." *Olis*, 429 F.3d at 545 (alteration in original) (quoting U.S. Sentencing Guidelines Manual Supp. to App. C Amendment 617 (Nov. 1, 2001)). Accordingly, a defendant's sentence should be based only on "losses . . . caused directly by the offense conduct." *Id.* at 546. "District courts must take a 'realistic, economic approach to determine what losses the defendant truly caused or intended to cause.'" *Id.* (quoting *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001)).

Bazemore contends that any losses to the insurers were not caused by his fraudulent scheme but rather resulted from the insurers' independent decisions to refund the premiums. Noting that only some of the insurers chose to refund premiums and that the lender chose to continue paying premiums on some policies, Bazemore asserts that any actual losses on policies were the result of the insurers' independent, erroneous determinations that the policies were not profitable—namely, "miscalculations regarding the applicants' likely life-span." In addition he argues that he did not cause any loss to EAA because the causal chain was "broken" by EAA's "fully informed decision . . . to buy the policies" from Portigon. Therefore he concludes that he did not cause any actual loss to either the insurers or the lender.[7]

Reviewing the record as a whole, we conclude that the district court did not err in finding that losses from the insurance policies were a reasonably foreseeable harm that resulted from Bazemore's fraudulent

---

[7] The Government contends that this argument is foreclosed by the law of the case doctrine, which required the district court to apply the actual loss formula described in *Bazemore I* for losses on rescinded policies. *See* 608 F. App'x at 217 ("The actual loss on a rescinded STOLI policy is the commission the insurer paid to Bazemore less any premium payments it retained."). But this argument is inapposite because here Bazemore is not challenging the *method* of calculating actual loss to the insurers; rather, he is challenging the district court's *factual finding* that he caused the loss to the insurers.

misrepresentations. The record demonstrates that insurers would not have issued the insurance policies but for Bazemore's misrepresentations of the applicant's net worth and intention to transfer the policy to an investor. *See Bazemore I*, 608 F. App'x at 209 ("The insurers that issued policies to Bazemore's applicants would, without exception, deny life insurance policies to applicants that intended from the outset to transfer the policy to a third party."); *Sentencing Handbook*, *supra*, at 352 ("[A] loss that 'resulted from' an offense is one that would not have occurred *but for* the occurrence of the offense."). And Bazemore knew that, as the agent responsible for the sale, he would receive a commission on each issued policy roughly equivalent to the amount of the first year's premium. *Id.* Thus, when Bazemore made fraudulent misrepresentations to the insurers regarding the net worth and intentions of the applicant, he "knew or, under the circumstances, reasonably should have known" that a potential result was monetary harm to the insurers—namely, the commissions they paid to Bazemore. *See* U.S. Sentencing Guidelines § 2B1.1 cmt. n.3(A)(iv) (defining "reasonably foreseeable pecuniary harm"). Furthermore the record indicates that life insurance policies for high net-worth individuals are often used as investment vehicles or financial instruments, thus it was foreseeable that the lender could transfer its interest in these policies to another party. Because the policies were the sole purpose behind (and the collateral supporting) the loans by the lender, Bazemore knew or reasonably should have known that losses to the lender would result from his fraudulent misrepresentations on the policy applications. *See* U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(A)(i)(iv).

We reject Bazemore's argument to the contrary. In particular, he fails to provide any meaningful support in the record for his argument that the

divergent outcomes of some of the policies and loans show that any loss resulted from the victims' own "miscalculations regarding the applicants' likely life-span." Standing alone, Bazemore's argument is insufficient to conclude that the district court did not make a plausible factual finding of causation based on the record as a whole. *See Caldwell*, 448 F.3d at 290. Thus, the district court did not commit clear error in finding that the actual losses to the insurers and the lender were "reasonably foreseeable pecuniary harm that resulted from [Bazemore's] offense." U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(A)(i).

## III. VIOLATION OF THE PROFFER AGREEMENT

The Guidelines generally prohibit information provided by the defendant "pursuant to" a cooperation agreement from being used to determine the applicable sentencing range. U.S. Sentencing Guidelines Manual § 1B1.8(a). Bazemore shared the details of his insurance fraud scheme with an FBI agent while he was covered by an agreement to proffer evidence in an unrelated securities fraud case. Bazemore contends that these statements to the FBI agent were covered by his proffer agreement and the district court, via imposition of the loss enhancement, improperly used information gleaned from these statements to determine his Guidelines sentencing range. We review *de novo* whether the Government has breached a proffer agreement. *See United States v. Gonzalez*, 309 F.3d 882, 886 (5th Cir. 2002).

Here we do not reach the merits of Bazemore's argument because we conclude that he waived it by failing to raise it in his original appeal. During Bazemore's first sentencing (like his resentencing), the district court used evidence that the Government obtained following Bazemore's statements to the FBI in order to calculate the appropriate loss enhancement to his sentence. In response, Bazemore objected that his proffer agreement precluded the

Government from using this information, but the district court expressly overruled that objection. Bazemore failed to challenge that ruling when he appealed his first sentence. His failure to do so bars him from making this argument now.

Bazemore attempts to circumvent waiver by arguing that his original appeal involved an objection to the intended loss amount rather than the actual loss amount and that "[t]he mandate rule does not require parties to raise all issues that are similar or analogous to claims that might be made on remand." This distinction is unpersuasive. As clearly stated in the Guidelines, the loss enhancement is based on the "greater of actual loss or intended loss." U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(A). And as Bazemore articulated in his objections during his first sentencing, "*any enhancements regarding loss* or committing insurance fraud . . .[were] protected under . . . the proffer agreement and cannot be used to increase Bazemore's [G]uideline range." (Emphasis added). The alleged violation of the proffer agreement affected the district court's first loss enhancement calculation (using intended loss) as much as it affected the court's loss enhancement recalculation (using actual loss) on resentencing. Therefore Bazemore had every reason to raise this alleged error when appealing his first sentence. Bazemore has waived this proffer agreement argument by failing to raise it in his original appeal.[8] *See Griffith*, 522 F.3d at 610.

## IV. *APPRENDI* CHALLENGE

It is well established that any fact—other than a prior conviction—that increases a defendant's maximum sentence "must be submitted to a jury, and

---

[8] While Bazemore alleges that a similar issue underlies the district court's application of a role enhancement to his sentence, Bazemore also failed to raise any objection to that enhancement during the original appeal and thus it is also waived. *Bazemore I*, 608 F. App'x at 213.

proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Bazemore argues that the district court violated this principle by making a factual finding—actual loss amount—that increased his maximum sentence. Although recognizing that this court has previously rejected this argument in *United States v. Tuma*, 738 F.3d 681, 693 (5th Cir. 2013), Bazemore suggests that the Supreme Court's recent decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), which was decided after his original appeal, calls *Tuma* into question. We review alleged violations of *Apprendi de novo*. *See Matthews*, 312 F.3d at 661.

To the extent that Bazemore is arguing that *Hurst* provides an intervening change in law that excuses his failure to raise this issue on his original appeal, *see Pineiro*, 470 F.3d at 205, this argument is unavailing because *Hurst*'s holding is inapplicable. *Hurst* held unconstitutional a statutory scheme in which "the maximum sentence a capital felon [could] receive on the basis of the [jury] conviction alone [was] life imprisonment" and the felon could receive a death sentence only if the court made additional findings at a subsequent sentencing proceeding. 136 S. Ct. at 620. *Hurst* therefore applies only to statutory schemes in which judge-made findings increase the maximum sentence that a defendant can receive. *Id.* at 622. In contrast, here the district court's actual loss findings did not increase the maximum punishment that Bazemore could receive; it sentenced him to 188 months' imprisonment, less than the 20 year statutory maximum for a mail fraud conviction.[9] *See* 18 U.S.C. § 1341; *see also Tuma*, 738 F.3d at 686, 693 (upholding that district court statutory maximum sentence). This "broad sentencing discretion, informed by judicial factfinding, does not violate the

---

[9] The court's actual finding did alter Bazemore's advisory Guidelines sentencing range, but it did not change the maximum punishment allowable by law.

Sixth Amendment." *Tuma*, 738 F.3d at 693; *see also United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005) ("The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence.").

Because *Hurst* does not provide a new basis for challenging his sentence, Bazemore waived this challenge to his sentence by failing to raise it in his original appeal. This *Apprendi* argument was relevant to Bazemore's prior appeal; at his first sentencing, the district court used its own findings of fact to determine the loss enhancement to Bazemore's sentence. It makes no material difference that the finding of fact at the first sentencing was on the intended loss amount whereas the resentencing finding was on the actual loss amount. *See* U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(A) (stating that the loss enhancement is based on the "greater of actual loss or intended loss"). Thus, whether judicial factfinding of a loss enhancement violated *Apprendi* "could have been brought in the original appeal," *Griffith*, 522 F.3d at 610 (emphasis omitted) (quoting *Lee*, 358 F.3d at 323), and is therefore waived in this subsequent appeal, *id.* at 611.

## V.  CONCLUSION

For the foregoing reasons we AFFIRM Bazemore's sentence.

21